# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

EDWARD THOMAS KENDRICKS,      )
                                       )
           Petitioner,         )
                                       )
v.                              )           No. 1:16-CV-00350-JRG-SKL
                                       )
SHAWN PHILLIPS,             )
                                       )
           Respondent.     )

## MEMORANDUM OPINION

Before the court is a pro se prisoner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 [Doc. 1]. Respondent has filed a response in opposition [Doc. 15], as well as the state court record [Doc. 14]. Petitioner filed a reply [Doc. 30]. After reviewing all of the relevant filings, the Court has determined that Petitioner is not entitled to relief under §2254 and no evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a) and *Schirro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons set forth below, the §2254 Petition is **DENIED** and this matter will be **DISMISSED**.

## I. PROCEDURAL HISTORY

In 1994, a Hamilton County jury convicted Petitioner of first-degree murder for shooting and killing his wife [Doc. 14 Attachment 1 at 24]. Petitioner appealed on several grounds including that the evidence was insufficient to support the finding of guilt by the jury, that the trial court erred in allowing and disallowing various pieces of evidence, and that the State had violated *Brady v. Maryland* by failing to disclose exculpatory information [Doc. 14 Attachment 9]. The Tennessee Court of Criminal Appeals ("TCCA") affirmed his conviction [Doc. 14 Attachment 11]. Petitioner then applied for permission to appeal to the Tennessee Supreme Court, but his application was denied [Doc. 14 Attachments 12, 15].

Next, Petitioner filed a motion for post-conviction relief alleging various grounds of ineffective assistance of counsel and various instances of prosecutorial misconduct [Doc. 14 Attachment 15 at 3 – 12]. His petition was summarily dismissed [Doc. 14 Attachment 16 at 63 – 64]. Thereafter, Petitioner amended his petition for post-conviction relief which was dismissed as untimely filed [Doc. 14 Attachment 16 at 65 – 81; 84]. Petitioner immediately appealed and the TCCA reversed in part and remanded for further proceedings on Petitioner's ineffective assistance of counsel claims, with specific instructions for the post-conviction court to allow Petitioner to amend his petition [Doc.14 Attachment 20].

Petitioner filed an amended petition in 2000, and over the next several years filed various amendments, with and without the assistance of counsel [Doc. 14 Attachments 21 at 5 – 114; 21 at 115 – 131; 21, at 140 – 141; 22 at 127 – 23 at 87; 23 at 88 – 123; 28 at 71 – 106; 28 at 107 – 29 at 5[1]]. In 2011, after hearings spanning various days in February and March, the post-conviction court dismissed the petition [Doc. 14 Attachment 29 at 6 – 72]. Petitioner then appealed to the TCCA again, which resulted in the TCCA reversing the judgment of the post-conviction court, vacating Petitioner's conviction, and remanding for further proceedings, based on two of Petitioner's ineffective assistance of counsel claims: (1) failure to adduce expert proof about a defective trigger mechanism design in Petitioner's rifle, and (2) failure to use the excited utterance exception to hearsay to admit the prior statements of an officer in the case [Doc. 14 Attachment 48].

The State appealed to the Tennessee Supreme Court ("TSC"), which found no ineffective assistance of counsel on either claim, reversed the TCCA's judgment, and remanded the case to the TCCA to address Petitioner's pretermitted claims [Doc. 14 Attachments 49, 60]. Petitioner

---

[1] For the sake of brevity this includes only Petitioner's amended petitions and not his vast Memoranda of Law, spanning hundreds of pages, which accompanied them and are separately labeled in the record.

then moved for a rehearing in the TSC which was denied [Doc.14 Attachments 61, 62]. He also filed a writ of certiorari with the United States Supreme Court which was also denied [Doc. 14 Attachments 63, 64]. Later, the TCCA evaluated Petitioner's remaining claims as directed by the TSC and affirmed the judgment denying petitioner post-conviction relief [Doc. 14 Attachment 72]. Petitioner filed an application for permission to appeal with the TSC, which was denied [Doc. 14 Attachments 73, 75]. Finally, in 2016 Petitioner filed for a writ of habeas corpus with this Court [Doc.1].

## II. BACKGROUND

### A. Trial

On Direct Appeal, the TCCA summarized the facts of this case as follows:

> On March 6, 1994, at approximately 10:00 p.m., the defendant drove to the gas station at which Lisa Kendrick, his wife and the victim, worked. With him in the car were their four-year-old daughter and three-year-old son. These children were sitting in car seats in the back seat of the station wagon the defendant was driving. Also in the car, on the front passenger floorboard, was the defendant's loaded 30.06 hunting rifle.

> The defendant pulled into the station, parked, and went into the market portion of the station where his wife worked as a cashier. He asked her to come outside, which she did. She and the defendant went to the car where she spoke briefly to the children. The defendant retrieved the rifle from the front passenger floorboard and carried it to the back of the car. At that point, the weapon fired once, the bullet striking the victim in her chest and killing her almost instantly.

> After the victim fell to the parking lot, the defendant briefly bent over her body, put the gun back in the car, and drove toward the airport a short distance away. On the way, he threw the rifle out of the car. Once he arrived at the airport, he called 911 and reported that he had shot his wife. Before the defendant left the gas station, he took no action to assist the victim in any way.

Timothy Shurd Benton, a customer, was in the market when the defendant entered. He testified that the defendant had asked the cashier "to step outside, he had something to show her." Benton left the market, got in his car and started to leave the parking lot. He testified that, as he had begun to leave, he heard an "explosion." He looked over his shoulder out the window of his car and saw the defendant holding a rifle "pointed straight up in the air." He also saw the victim lying on her back on the parking lot. After deciding that another person in the market was aware of the situation and would call for help, Benton followed the defendant to the airport, where he contacted an airport police officer.

Lennell Shepheard was also in the market at the time the defendant entered. He testified that he had seen the defendant and his wife leave the store, that the defendant had not appeared angry or hostile, and that the victim had shown no signs of fear when she went outside at the defendant's request. Shepheard remained in the store until he heard the rifle shot. At that point, he opened the market door and looked outside to see what had happened. He testified that he had seen the defendant shut the back passenger door and then lean over the victim's body and state, "I told you so" approximately six times.

Endia Kendrick, the defendant's four-year-old daughter, testified on direct examination that she had seen her father shoot her mother and that her mother had had her arms up at the time. However, on cross-examination, Endia admitted that she hadn't actually seen the shooting.

Dr. Frank King, the Hamilton County Medical Examiner, testified that the victim had died of a single gunshot wound to the chest that entered her body in the left chest at forty-nine inches above the heel and exited her body at the left back at forty-nine and one-half inches above the heel.

The defendant testified that he had been moving the rifle from the front of the car to the back at the request of the victim and that it had discharged accidentally. He testified that he had been shifting it from one hand to the other when it went off. He testified that he had not pulled the trigger. He steadfastly denied that he had intended to shoot the victim, and claimed that he had been carrying the rifle in the car because he sometimes cleaned apartments near an area where he felt a gun was necessary for personal protection. He also denied making any statements as he bent over the victim, and testified that he had taken no action to assist her because he knew she was dead. The defendant also testified that he and the victim had agreed on an

irreconcilable differences divorce, that an attempted reconciliation had recently failed, and that he suspected that she had had or was having an affair. He denied that he was upset or angry at his wife about the status of their relationshiat

In support of his contention that the rifle fired accidentally, the defendant relied on the testimony of Officer Steve W. Miller. Officer Miller testified that he had shot himself in the foot with the rifle when he was removing it from the trunk of his car after recovering it from where the defendant had thrown it. Officer Miller testified that he had shot himself accidentally. He further testified that he could not recall whether or not his finger had been on the trigger of the gun when it fired.

[The state's expert witness,] Kelly Fite, a firearms examiner, testified that he had examined and tested the rifle and that, in his opinion, "[t]he only way that you can fire this rifle without breaking it is by pulling the trigger."

After the defense closed its proof, the State called Martha Kay Maston as a "rebuttal" witness. Maston testified that she had been working as a public safety officer for the Chattanooga Metropolitan Airport Police on the night of the shooting. On finding the defendant at the airport, she saw the two children in the back seat of the car. She testified that she had gotten the children out and that they were both "very upset and hysterical." She further testified that "when I got [the little girl] out of the car, she just put her arms around me and she stated that she had told daddy not to shoot mommy but he did and she fell." Maston testified that the defendant's daughter had not made any other statements and that his son had not said anything.

*State v. Kendricks*, 947 S.W.2d 875, 878 – 79 (Tenn. Crim. App. 1996).

## B. Post – Conviction

As stated above, the post-conviction trial court conducted hearings over several days in February and March of 2011. In its second opinion addressing the dismissal of Petitioner's post-conviction petition, the TCCA summarized the evidence adduced at these hearings as follows:

Henry Jackson Belk, Jr., a gunsmith, testified that, earlier that morning in the clerk's office, he examined the gun, a Remington Model 7400 30.06 autoloading rifle, that shot and killed the victim. He stated that he was familiar with the trigger mechanism inside the rifle, describing it as "a common trigger mechanism that is

contained within a wide variety of firearms, shotguns, rim fires and center fire rifles." He added, "Generally speaking, all pumps and automatics manufactured after 1948 by Remington contain this trigger mechanism." Belk testified that the trigger mechanism is referred to as the "Remington Common Fire Control" ("the Common Fire Control").

Belk stated that the Common Fire Control was first used in the automatic shotgun in 1948, then in the pump shotgun in 1950, and then in the automatic rifle in 1951. The Common Fire Control is currently used in 23 million firearms. Because the Common Fire Control is used in different firearms, any "issue" with the trigger mechanism would not be limited to one specific type of firearm. According to Belk, the Common Fire Control is a "defective mechanism."

As to the rifle in this case, Belk stated that it had "the normal dirt, dried oil and residue common to a gun that has not been cleaned." After removing the trigger mechanism while he was on the witness stand, Belk examined the rifle and stated that "the action spring is sticky." He explained that the "action spring . . . supplie[d] the energy for the bolt to return back forward." Because the action spring was "sticky," the bolt was "not going forward as freely as it should." Belk explained that the action spring's condition was consistent with a firearm that had not been cleaned.

Turning his attention to the trigger mechanism, Belk testified about how it could malfunction:

> The general description here is this is a swing hammer mechanism; in other words, it fires by a hammer going forward and hitting a firing pin that's contained in the bolt inside the housing. The sear is the part that retains the hammer. The sear is what holds the hammer back, does not fire. On this particular mechanism, on all these Remington mechanisms, that sear is an independent part, is right here. That is an independent part, not on the end of the trigger like a Browning design is.

> For that reason, and the fact that the safety only blocks the trigger, it does not block the action of the sear or the hammer, it only blocks the trigger, any debris that is captured between the sear and the slot that it is housed in, which is the housing, any debris that is caught between the bottom or the tail of

the sear and the stock surface inside the housing, any debris that gathers there, any debris that gathers between the trigger yoke and the rear pivot pin and the trigger pusher arm and the bottom of the sear, any debris in any of those places, alone or in concert, can cause an insecure engagement between the hammer and the sear itself.

So even with a gun on safe, which it is now, it can still fire, which it just did. Without pulling the trigger, on safe.

Responding to questions by the court, Belk clarified: "I can pull the trigger and make it fire, just like that (indicating), or I can put it on safe without the trigger being pulled and fire it just by manipulation of the sear."

Belk continued:

The notch in the hammer determines how much debris it takes to make it fail. The notch in the hammer is about 18,000 of an inch deep, about the thickness of a matchbook cover. . . . [A]nything that totals that amount of distance can make a gun fail.
. . . .
Any of those other locations, it takes about 18,000ths in order to interfere with the secure engagement of the hammer and the sear.

Belk clarified that there were five locations in the trigger mechanism that made the mechanism "weak" and that could collect the requisite amount of debris to cause a misfire. Moreover, of the five "weak spots," "the clearance between the sear and the housing itself is usually about 4,000ths, so it would take less debris captured between those places to retard the proper motion of the sear and would also cause it to fail. So it wouldn't necessarily take as much as 18,000ths."

Belk also testified that "[t]he Remington Common Fire Control has a history of firing under outside influences other than a manual pull of the trigger. Vibration is one way that can happen. Impact. Even in one case the simple act of grabbing the gun by [the forward part of the stock] caused it to fire." Belk reiterated that the Common Fire Control "fires without the control of the trigger. It can fire out of the control of the shooter. It can discharge without any hand being on the stock."

Belk stated that, if debris caused the gun to fire unintentionally, the debris could be dislodged during the discharge. He added,

> On this semi-automatic, each time the gun is fired, the hammer goes forward, and then under great pressure and speed, the hammer is forced back again into position. So there's a lot of cycling going on.
> There's also the disconnector here, there's a lot of movement in the
> mechanism itself during firing and during manipulation after firing. And that movement, many times, dislodges the debris that actually was the causation.

Belk acknowledged that debris also can be dislodged through a gun being dropped or "banged around." He acknowledged that a drop test "many times[] destroys any evidence that was there." He explained that the standardized tests of dropping a firearm "on a hundred durometer rubber pad from a certain distance in certain orientations . . . does nothing whatsoever to analyze the mechanism and how it can fail. So the . . . drop test in itself can be destructive [by dislodging debris] without actually showing anything." He added, "[T]his particular mechanism has what is called a recapture angle. So, impact, as in dropping it on the floor, will actually recapture the sear engagement rather than dislodge it. So the . . . drop test on this particular gun is pretty much useless."

Belk opined that the rifle which shot and killed the victim "is capable of firing without a pull of the trigger, whether the safety is on or off."

Belk testified that he was first hired to work on a case involving the Common Fire Control in 1994, and he agreed that, "if someone had done some research, they would have potentially been able to find [him]." He also testified that problems with Remington firearms could be reported to the manufacturer, which maintained "some" records of complaints. According to Belk, people were complaining prior to his initial involvement. He testified that he "first identified the problem with the Remington Common Fire Control in 1970." When a "co-shooter" on a skeet-range complained of trigger problems, Belk disassembled the trigger mechanism and "found a section of lead shot debris stuck in the sear notch of the hammer." He added, "That was the first identification that [he] had of a bad mechanism, that it could fire without a trigger being

pulled." Since then, he had consulted with "many, many attorneys." One case involved a Remington 7400 that fired while it was being cleaned with an air hose. The safety on that gun had been engaged. Another gun fired while being wiped with a rag. Another gun fired when the butt-end of the stock was placed on the floor.

On cross-examination, Belk admitted that, while the trigger assembly was in the Petitioner's rifle, the rifle had not misfired during Belk's handling of it. He also admitted that he could not opine about the cleanliness of the gun in March 1994. He stated that he testified in a case involving a Remington 7400 in 1997 or 1998.

On redirect examination, Belk testified that he was familiar with a case in which a Remington shotgun containing the Common Fire Control fired while it was in a locked case and with the safety engaged. The gun was strapped to the handlebars of an ATV that had been left idling. The vibrations caused the gun to fire. Belk stated that he had been consulted on "probably two dozen" cases involving the Common Fire Control in which the gun discharged and injured someone.

On re-cross examination, Belk maintained that he had previously been able to induce a misfire by "artificially introducing" debris in "any" of the previously identified "weak spots." He clarified that he induced these misfires in "cutaway" guns.

Sergeant Steve Miller of the Chattanooga Police Department ("CPD") testified that, on the night the victim was killed, he was assigned to the case as a crime scene investigator. He testified that the firearm was not located at the scene of the shooting. When a "[c]all came across the police radio that a gun had been located down Airport Road," Sgt. Miller went to locate the firearm. He located the rifle on the side of Airport Road and noted that there was no clip in it. He photographed the rifle and collected it for evidence, placing it in the trunk of his patrol car. Sgt. Miller transported the rifle back to the police service center on Amnicola Highway.

Sgt. Miller agreed that he was handling the rifle carefully in order to preserve fingerprints. He also acknowledged that he testified at trial that he had a jacket in his left hand and that he "grabbed" the rifle from the trunk of his patrol car with his right hand and "pointed it in a downward motion" towards the pavement. When Sgt. Miller pointed it in the downward motion, the rifle discharged, injuring his left foot. Sgt. Miller testified that he "can't say with a hundred percent accuracy" whether his fingers were

anywhere near the trigger but stated that "[t]hey shouldn't have been."

Sgt. Miller acknowledged his signature on the bottom of a report prepared by Michael Taylor on March 7, 1994 ("the Taylor report"). The Taylor report, admitted into evidence, reflected that James Gann was the first officer to respond to Sgt. Miller's injury, and Sgt. Miller's recollection at the post-conviction hearing was consistent: that Officer James Gann came out of the service building to see what had happened after Sgt. Miller shot himself. Sgt. Miller also acknowledged that the Taylor report indicated that he told the "initial officer that he had both hands on the rifle and did not have his finger near the trigger." Sgt. Miller testified that he suffered "a massive foot injury" that was "extremely painful." Sgt. Miller agreed that the wound also was stressful.

On cross-examination, Sgt. Miller agreed that he was called by the State as a witness at the Petitioner's trial. He agreed that defense counsel questioned him at the trial and asked questions about where his fingers were with respect to the trigger when he shot himself. He also remembered that defense counsel's cross-examination was "tough."

On redirect examination, Sgt. Miller testified that defense counsel did not interview him prior to the trial.

Glenn Sims, retired from the CPD, acknowledged that he prepared a police report in connection with Sgt. Miller's incident, but he did not recall speaking with Sgt. Miller. He acknowledged that, according to his report, Sgt. Miller "was taking the firearm . . . that he had collected into evidence, out of the truck of the vehicle [and] it discharged[.]" The report further reflected that "the rifle swung down, [Sgt. Miller] wasn't sure if it hit his foot or the ground, but it went off, hitting Miller in the left inside foot." Sims agreed that the report reflected that the rifle "just went off."

James A. Gann testified that he was employed by the CPD in 1994 and that he was one of the officers who investigated Sgt. Miller's incident. He stated that he was in the office when he heard "a loud recoil of a gun." Gann went outside to investigate and saw that Sgt. Miller was shot in the foot. Gann radioed for an ambulance and alerted the appropriate people who "had to be advised on a shooting." Gann stated that Sgt. Miller was "in a lot of pain, bleeding, and starting to go into shock." Gann could not recall whether he spoke to Sgt. Miller about what had happened, explaining that he "was more concerned with his foot, he was

bleeding." Referring to a police report that Sgt. Glenn Sims had prepared, Gann acknowledged that Sgt. Miller had told Gann that, while Sgt. Miller was taking the rifle out of the trunk, the gun "just went off." Gann also testified that he was not contacted by anyone from the public defender's office before the Petitioner's trial.

Officer Michael Holbrook of the CPD testified that he was dispatched to Erlanger Hospital to respond to an accident involving Sgt. Miller. Officer Holbrook spoke to Sgt. Miller at the hospital and prepared a report regarding their conversation. Officer Holbrook testified that Sgt. Miller told him that "as he was taking the rifle out of the trunk of his patrol car, the rifle went off and shot him in the foot." Sgt. Miller also told Officer Holbrook that his hands were not on the rifle's trigger. Officer Holbrook's report was consistent with his testimony and contained the following narrative: "As he was lifting out the rifle, the weapon went off and struck him in the left foot. [Sgt.] Miller states that he picked it up with both hands and his finger was not near the trigger." Officer Holbrook's report, dated March 7, 1994, was admitted as an exhibit.

The Petitioner's trial lawyer ("Trial Counsel") testified that he worked for the public defender's office in 1994 and represented the Petitioner at trial. He stated that two investigators assisted him in investigating the case. Trial Counsel agreed that the Petitioner's appointed counsel in general sessions waived the preliminary hearing in exchange for "an open file policy."

Trial Counsel testified that, from the beginning, the Petitioner maintained that the rifle accidentally discharged. He also testified that Sgt. Miller had made statements indicating that "he was not holding the gun anywhere near the trigger housing and it discharged, shooting him in the foot." Trial Counsel stated that he never looked for an expert witness to support the Petitioner's accidental discharge claim. He testified that the public defender's office informally consulted with a gunsmith who was a former Red Bank police officer, but he did not remember whether he spoke to him about this case. Trial Counsel also agreed that he performed no research regarding the trigger mechanism in the Remington 7400 rifle. He added, "[a]s a matter of fact, when I heard on NPR, a year or so ago, that the Remington trigger mechanism was faulty and [there had] been several apparent accidental deaths as a result of it, you're the first person I contacted, because I thought, I remembered it was a Remington and I thought it was something very important." Trial Counsel generally recalled that the State's expert, Kelly Fite, performed a "drop test" on the rifle. He agreed that Fite's report did not indicate that Fite inspected the trigger mechanism.

Asked whether it would have been beneficial for an expert to testify on the Petitioner's behalf about the trigger mechanism, Trial Counsel answered, "In hindsight, especially with the knowledge now that there have been so many problems with the Remington trigger mechanism, yeah." Asked about his knowledge of any discussions in the industry regarding the trigger mechanism misfiring, Trial Counsel responded:

> I wasn't aware of any. And I will point out, at the time, I was the only public defender in Division II, and in that period of time in little over four years, I probably tried, literally, 40 first degree murder cases, settled another 40 to 50, and I will concede I didn't put nearly as much time in on his case or any other cases that I tried as I do now in my private practice, because I've got a lot more time. My average caseload every Thursday for settlement day was between 20 and 30 defendants. My average month included at least 2 if not 3 trials. So I wasn't aware of the issue with the trigger pull.

Trial counsel also added that, although he had "a fundamental knowledge of firearms, [he] was not aware of it and . . . [he] didn't know it and [he] didn't get an expert." He also explained,

> I thought [Sgt.] Miller would testify consistently with what I knew to be his statements, and I thought that would come in and I thought that when that did come in, I could use that very effectively to say, okay, if [the Petitioner] can't accidentally have that gun [go] off, neither can [Sgt.] Miller, so, therefore, you got to presume that [Sgt.] Miller shot himself in the foot on purpose. That was my whole line of reasoning in this case.

Trial Counsel testified that he "was not prepared for [Sgt.] Miller to say he couldn't remember, because there was not any doubt in [Trial Counsel's] mind, at least, when [they] started trying this case, that he was going to stick to his prior statements." Accordingly, Trial Counsel had no "backup plan" to call other officers to testify about what Sgt. Miller had told them after he shot himself. Trial counsel felt "sandbagged" by Sgt. Miller's trial

testimony. He recalled the trial court refusing to allow him to introduce one of the reports generated about Sgt. Miller's injury in which Sgt. Miller reported that his hands had not been near the rifle's trigger when it misfired. He did not request to make an offer of proof. He also did not attempt to introduce Sgt. Miller's statements as excited utterances, explaining, "[i]n the heat of the trial, I didn't see that."

Trial Counsel agreed that both Lennell Shepheard and Sgt. Miller's testimony at trial differed from their statements that the State provided the defense during discovery. Trial Counsel stated that the first time he heard Shepheard claim the Petitioner stated "I told you so" was during Shepheard's testimony. Trial Counsel agreed that he was never provided notice by the State prior to these two witnesses testifying that the substance of their pretrial statements had changed materially. Trial counsel also stated that, although he was not the Petitioner's counsel at the preliminary hearing stage, he would expect "in exchange for the waiver of a preliminary hearing, especially in a first degree murder case, that there would be some extra benefit to come to the defendant through the discovery process." He added, "if [Sgt.] Miller was going to change his story, we should have been made aware of that, if Mr. Shepheard was going to add to his story, we should have been made aware of that."

On cross-examination, Trial Counsel stated that he began practicing law in Tennessee in April 1978 and had been in continuous practice since that time. At the time of the Petitioner's trial, Trial Counsel had been practicing law for sixteen years, primarily in criminal defense. Trial Counsel also stated that he was employed at the public defender's office at the time of the Petitioner's trial and had worked in that capacity for approximately five years. Trial Counsel had tried at least sixty to seventy cases by 1994, including murder cases, less-serious cases, and death penalty cases. He stated that he tried in excess of forty murder cases prior to this case. Trial Counsel testified that he was assigned this case at arraignment.

Before meeting with the Petitioner, Trial Counsel stated that the Petitioner completed an "intake sheet" wherein he wrote out his "side of the story." Trial Counsel testified that the Petitioner was on bond when he was assigned to the Petitioner's case and that he

remained on bond throughout his representation of him. The offense occurred in March 1994, and the Petitioner's trial was in November 1994. Trial Counsel agreed that this was a "little quick." Trial Counsel could not recall whether the Petitioner had desired that the case proceed to trial quickly.

Trial Counsel acknowledged that he and the Petitioner discussed the strategy in the case. He stated, again, that the Petitioner maintained from the beginning that the rifle accidentally discharged and that there was "no real animosity" between him and the victim. Trial Counsel also stated that, in his preparation for the trial, he reviewed documents provided to the defense by the State. Trial Counsel testified that he typically would meet at the district attorney's office to review documents the State provided him in a case. He could not recall particularly whether he had a meeting in the district attorney's office in this case but stated that was his "standard operating procedure." He added, "I'm sure we met on it several times, not just one time." Trial Counsel stated that he was "confident" that the standard discovery motions were filed in this case although he could not specifically recall filing them. He stated that he filed the "standard motions" with every appointment he received. Pursuant to those discovery motions, Trial Counsel stated that he received documents from the State in this case and that he reviewed them to prepare for the trial. He also stated that the documents included the names of witnesses, and he agreed that the documents also included witness statements "in theory."

Trial Counsel recalled discussing the Petitioner's testimony with him prior to trial. He was "pretty confident" that he and the Petitioner "went through sit-downs where [Trial Counsel] cross-examined" the Petitioner. He added that, for every trial in which the defendant was going to testify, he would "sit down and grill them" so that they could anticipate what cross-examination would be like.

Trial Counsel did not recall specifically "familiarizing [him]self with the schematic of the [rifle]" prior to the trial, but stated that he was "relatively familiar with guns." Although Trial Counsel could not recall specifically looking at the rifle before the trial, he stated, "I'm sure I did. . . . I'm sure I looked at it in your office too." Trial Counsel also could not recall specifically his cross-

examination of Sgt. Miller. However, he stated, "I try to be vigorous [in cross-examination] especially when I think somebody's not telling the truth, and I thought that he wasn't telling the truth." He also recalled calling Sgt. Miller to testify during the defense's proof. He acknowledged that he recalled Sgt. Miller with the purpose of trying to impeach him with prior inconsistent statements.

Richard Mabee testified that, as of the time of the post-conviction hearing, he had been an assistant public defender for approximately nineteen years. He represented the Petitioner at the Petitioner's preliminary hearing. Mabee testified regarding the "one-time sheet" for the Petitioner's case, which was admitted as an exhibit at the hearing. According to Mabee, a one-time sheet lists basic information about the defendant, identifies the judge and the charges, and the disposition of the case at the general sessions level. According to Mabee, the disposition on the Petitioner's one-time sheet provided, "waived to grand jury, $50,000 bond. DA agreed to show everything." Mabee testified that this latter notation indicated that he had talked to the district attorney assigned to the case, and the district attorney had said, "[I]f you'll waive preliminary hearing, we'll show you everything in our file." Mabee stated that he then would have presented this information to the Petitioner and that it would have been up to the Petitioner to decide whether to waive the preliminary hearing.

On cross-examination, Mabee agreed that the notations on the Petitioner's one-time sheet appeared to be his handwriting. Mabee explained that, when public defenders get appointed in general sessions, they "open up a one-time sheet" which means that the public defender represented that defendant one time at the preliminary hearing. Mabee also clarified that the judge previously would have signed the order of appointment at the bottom of the one-time sheet prior to the public defender's notations regarding the disposition of the case.

On re-direct examination, Mabee stated that he made the notation, "[W]e'll show you everything in our file," because "that's exactly the words the [district attorney] said to [him]." Mabee added that, after his representation of someone, he would take the one-time sheet back to the public defender's office where it was placed in a "big drawer of one-time sheets." He stated, "[A]fter someone [was]

appointed in a higher court, they may or may not get that one-time sheet."

The Petitioner testified that the first time Trial Counsel met with him was at the county jail. During this initial meeting, the Petitioner completed an "intake sheet" and told Trial Counsel that the rifle had "accidentally discharged." Trial Counsel informed the Petitioner that Sgt. Miller had shot himself with the Petitioner's rifle and told the Petitioner that Sgt. Miller's incident supported the Petitioner's account of what had occurred.

The Petitioner recalled only two meetings with Trial Counsel after he was released on bond: one meeting occurred on or around June 1, 1994, and the second meeting occurred two or three months before trial. The Petitioner agreed that they discussed "trial strategy" during these meetings and their defense that the rifle accidentally discharged. During one of their meetings, Trial Counsel asked the Petitioner what had happened on the day of the incident, and the Petitioner informed him what he did that day. The Petitioner denied that Trial Counsel ever told him "that any evidence in this case would be damning to [him]," including the fact that he threw the rifle out of his car window. He also did not recall that Trial Counsel "went through a cross-examination of [him]."

The Petitioner stated that he got the rifle at least ten years before the killing and that he had shot it numerous times. The Petitioner testified that, although he wiped down the outside of the rifle, he never did "any maintenance in regards to the inside" of it because he did not know he was supposed to. He agreed that he testified at trial that he had never had a problem with the rifle accidentally discharging during the time he owned it.

The State asked the Petitioner whether it was Trial Counsel's "idea to use accidental discharge as the theory of the case[.]" The Petitioner responded, "I mean he's the lawyer, I mean he makes the ultimate decision, so I guess I have to say so, yes, based upon . . . his investigation and everything, yeah, I'd say it was."

Kendrick[2] v. State, No. E2011-02367-CCA-R3-PC, 2013 Tenn. Crim. App. LEXIS 539, at *7 –

31 (Tenn. Crim. App. 2013). Due to the extraordinary length of the record in this case, many of

the facts relevant to Petitioner's claims are not discussed here and will instead be addressed in the

analysis below.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28

U.S.C. §2254, a district court may not grant habeas corpus relief for a claim that a state court

adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2). This standard is intentionally difficult to meet. *Woods v. Donald*,

135 S. Ct. 1372, 1376 (2015) (quotation marks omitted). Under the unreasonable application

clause, the proper inquiry is whether the state court's decision was "objectively unreasonable,"

and not simply erroneous or incorrect. *Williams v. Taylor*, 529 U.S. 362, 409 – 11 (2000). The

AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d

1131, 1134 (6th Cir. 1998). Where the record supports the state court's findings of fact, those

findings are entitled to a presumption of correctness which may be rebutted only by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1).

---

[2] In his habeas petition, Petitioner lists his name as Edward Thomas Kendricks, III, but in many pleadings lists his last name as Kendrick. The state courts vary in which name is they adopt, this Court will use Kendricks.

## IV. ANALYSIS

### A.  Exhaustion and Procedural Default

In his §2254 petition, Petitioner raises forty-eight claims for relief that he classifies in five broad categories: (1) ineffective assistance of counsel, (2) ineffective assistance of new trial and appellate counsel, (3) prosecution suppression of evidence, (4) new evidence, and (5) a singular claim that the AEDPA is an unconstitutional extension of Congressional power.  Respondent argues that many of the claims set forth in Petitioner's federal habeas corpus petition have been procedurally defaulted and may not now be addressed on the merits.  Petitioner first suggests that his claims have not been procedurally defaulted, and second offers multiple alternative grounds for which to excuse any procedural default.  This Court finds that Petitioner's claims raised only in his pro se briefs were abandoned on appeal and have been procedurally barred. As there is no valid cause for the court to address these claims, the Court will only address the eighteen claims, spanning eleven issues, Petitioner now raises which were properly included in the appellate briefs filed by counsel.

Before a federal court may grant habeas relief to a state prisoner, the prisoner must first exhaust the remedies available in state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S.  838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims to state courts to ensure states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.  1990); *see O'Sullivan*, 526 U.S. at 842. Generally, to fulfill the exhaustion requirement, each claim must have been presented to all levels of the state appellate system, including the state's highest court.  *Duncan v. Henry*, 513 U.S.  364, 365-66 (1995); *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).  The Tennessee Supreme Court has established, however, that when the Tennessee Court of Criminal Appeals has denied

relief on a claim, it is exhausted regardless of appeal to the Tennessee Supreme Court. Tenn. S. Ct. Rule 39 (Supp. 2001). Nevertheless, if there are no further state court remedies available to the petitioner, lack of exhaustion will not foreclose merits review. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

When a claim was never presented to the highest available state court and is now barred from such presentation by a state procedural rule, the claim may be considered "exhausted, but procedurally barred from habeas review." *Wallace v. Sexton*, 570 Fed. Appx. 443, 449 (6th Cir. 2014). Procedural default may also occur when a state court is prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground, and Petitioner "cannot show cause and prejudice to excuse his failure to comply." *Id.* at 449 (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549-550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84 87 (1977)). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

On Petitioner's direct appeal, he raised twelve issues, three pertaining to the sufficiency of the evidence, eight questions of trial court error, and one question of prosecution suppression regarding the testimony of Martha Maston as a surprise witness [Doc. 14 Attachment 9]. Later, on his first appeal of the dismissal of his state petition for post-conviction relief, Petitioner raised six issues of trial court error, all relating to the summary dismissal of his post-conviction petition [Doc. 14 Attachment 17]. On his second appeal, in an opening brief appealing the denial of post-conviction relief, Petitioner's counsel raised two issues – (1) that the post-conviction trial court

had used the wrong standard in evaluating Petitioner's claims, and (2) that the cumulative effect of trial counsel's deficient performance was sufficiently prejudicial to warrant relief [Doc. 14 Attachment 45].[3] After what appears to be a significant amount of tension between counsel and Petitioner regarding counsel's filing of the brief prior to Petitioner's approval and Petitioner's concern that counsel had waived many of his issues by omission, counsel attempted to withdraw from representation and asked the TCCA to issue a new briefing schedule, both of which were denied [Doc. 1 Attachments 1, 4]. At this time, counsel attempted to incorporate Petitioner's previously raised claims by reference in the reply brief [Doc. 14 Attachment 47]. In its opinion, the TCCA briefly outlined Petitioner's issues but did not expressly state which it would be considering; instead, it granted Petitioner relief on two sub-issues included within the claim of ineffective assistance of trial counsel – counsel's failure to adduce proof regarding a defective trigger mechanism design related to the propensity of Petitioner's rifle for accidental discharge, and counsel's failure to introduce the testimony of Officer Steve Miller's pretrial statements as excited utterances – and noted that it was pretermitting others [Doc.14 Attachment 48].

The State appealed to the TSC, claiming error by the TCCA regarding both of the findings that Petitioner was entitled to post-conviction relief [Doc. 14 Attachment 52]. In a pro-se response, Petitioner attempted to include most, if not all, of the claims he had previously litigated in the post-conviction trial court, including those not addressed or outlined by the TCCA [Doc. 14 Attachments 56, 57]. Counsel filed a supplemental brief responding only to the two issues set out by the State in their opening brief [Doc. 14 Attachment 58]. The TSC addressed only the two issues identified by the State and reversed on both grounds, remanding the case to the TCCA to

---

[3] This claim encompassed both a legal and factual analysis of several of the claims of ineffective assistance of trial counsel and appellate counsel Petitioner litigated in the post-conviction trial court below and raises now in his federal habeas corpus petition.

address Petitioner's remaining claims [Doc. 14 Attachment 60].  Petitioner filed a motion for supplemental briefing before his pretermitted claims were considered, which the TCCA denied [Doc. 14 Attachments 65, 70].  In its opinion on remand, the TCCA clarified the pretermitted issues as: (1) ineffective assistance of trial counsel for waiving Petitioner's attorney-client privilege with his divorce attorney, (2) ineffective assistance of trial counsel for failing to call the Petitioner's cousin as a witness, (3) ineffective assistance of trial counsel for "opening the door" to Petitioner's prior convictions, (4) ineffective assistance of trial counsel for failing to adequately challenge Lennell Shepheard's testimony,  (5) ineffective assistance of trial counsel for failing to call Officer Lapointe to testify to Petitioner's state of mind after the crime, (6) ineffective assistance of trial and appellate counsel for failure to object to Detective Rawlston's use of Petitioner's volunteered testimony after arrest, (7) ineffective assistance of trial counsel for failure to seek curative measures for the surprise testimony of Martha Maston, and (8) whether the cumulative impact of counsels' errors entitle him to relief.  The TCCA stated that all other claims had been abandoned on appeal [Doc. 14 Attachment 72 at 5].[4]

Due to Tennessee's one-year statute of limitations and one petition rule, state remedies are foreclosed to Petitioner and lack of exhaustion will not prevent federal habeas review of his claims.  *Rust*, 17 F.3d at 160; *see* Tenn. Code Ann. § 40-30-102.  However, while Petitioner posits that all of his current claims have been fairly presented to either the TCCA or the TSC, presumably relying first on the incorporation by reference in his reply brief presented to the TCCA on his second-appeal of the dismissal of his post-conviction relief, and second on his "unchallenged" pro se

---

[4] "While it is true that the Petitioner raised an additional forty-one issues of ineffective assistance of trial counsel, twenty-two claims of ineffective assistance of appellate counsel on direct appeal, and twelve claims of prosecutorial misconduct, many of these claims have been abandoned on appeal.  Accordingly, we will focus only on those issues raised by the Petitioner in his appellate brief.  See Tenn.  R.  App.  P.  13(b) ('Review generally will extend only to those issues presented for review.')" *Kendrick*, 2015 Tenn. Crim. App. LEXIS 887, at *10 – 11.

response brief to the TSC [Doc. 2 at 8], a majority of the claims he now raises were procedurally defaulted and will not be reviewed on their merits.[5]  The state courts were prevented from reaching the merits of Petitioner's claims because they found that his claims were abandoned on appeal [Doc. 14 Attachment 72 at 5].  Petitioner appears to argue that this finding is the result of the misapplication or arbitrary application of procedural law [Doc. 2 at 11].  However, although the state court offered no explanation for its finding of abandonment, this Court finds that it had adequate and independent, regularly enforced, state grounds to find that Petitioner's claims had not been fairly presented.  *See Wallace*, 570 Fed. Appx. at 449 (6th Cir. 2014) (citing *Maupin*, 785 F.2d at 138 (6th Cir. 1986)).

Specifically, Petitioner's claims were not fairly presented to an appropriate state court because a Tennessee procedural rule barred consideration of his pro se briefs.[6]  "In Tennessee, a petitioner represented by either retained or appointed counsel may not file pro se briefs." *Wallace*, 570 Fed. Appx. at 451 (*citing State v. Burkhart*, 451 S.W.2d 365, 371 (Tenn. 1976)); *Williams v. State*, 44 S.W.3d 464, 469 (Tenn. 2001) (barring defendants from "representing themselves while simultaneously being represented by counsel")).  This rule is an adequate and independent state ground, regularly enforced, sufficient to foreclose state review of Petitioner's claims and procedurally default said claims before a federal court.  *See Wallace*, 570 Fed. Appx. at 451. Further, in *Wallace,* the petitioner argued that his claims were fairly presented because counsel

---

[5] In the event that Petitioner also intends to allege that the presentation of his claims in his Application for Permission to Appeal or Motion to Rehear satisfy exhaustion requirements, we note that raising a claim "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor, [does not] constitute fair presentation." *Olson*, 604 Fed. Appx. 387, 402 (6th Cir. 2015) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

[6] As in *Wallace*, "the state post-conviction appellate court did not explicitly state that it declined to consider [Petitioner]'s supplemental pro se brief.  However, it responded in detail to claims raised by [] counsel, […] without even mentioning [Petitioner's] supplemental brief or any of the claims raised therein.  We can infer only that the court applied the Tennessee procedural rule barring consideration of pro se filings made by represented petitioners." 570 Fed. Appx. 443, 452 (6th Cir. 2014).

*attached* his claims as an appendix to his own brief, yet the Court still found that Tennessee was within its discretion to decline to address such claims. *Id*. at 452.

Here, counsel did not attach Petitioner's claims but rather tried to incorporate them by reference in her reply brief. Not only would the state court have been prevented from addressing the pro se brief in conjunction with counsel's brief, but this also improperly expanded counsel's reply brief. In Tennessee, "[a] reply brief is limited in scope to a rebuttal of the argument advanced in the appellee's brief." *Caruthers v. State*, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991). Counsel could not add new arguments in her reply brief, by reference or otherwise, because to do so "would be fundamentally unfair as the appellee may not respond to a reply brief." *Caruthers*, 814 S.W.2d at 69; *see also Flinn v. Sexton*, 2018 U.S. Dist. Lexis 36927 (E.D. Tn. 2018). Petitioner has not demonstrated, and this Court cannot find, that the state courts arbitrarily enforced these rules to find that Petitioner did not fairly present his claims.

Like the reply brief discussed above, Petitioner's response brief on appeal to the TSC involved issues of Petitioner's brief being filed alongside a brief filed by counsel, although admittedly Petitioner's brief was filed first and counsel's as a supplement. Again, the TSC did not address Petitioner's additional claims, but did consider the arguments made in counsel's brief, leading us to infer that Tennessee was enforcing its own procedural rule regarding pro se filings from represented petitioners. *Kendrick v. State*, 454 S.W.3d 450, 475 – 76 (Tenn. 2015).

Moreover, even if Tennessee courts had looked to Petitioner's brief, Petitioner did not properly raise each of his previously litigated claims in his response. Petitioner correctly points to case law that asserts that appellees may include issues in response briefs not included by the appellant, as long as such is done in conjunction with the Tennessee Rules of Appellate Procedure. *See Mobley v. State*, 397 S.W.3d 70, 103 – 104 (Tenn. 2013); *Hodge v. Craig*, 382 S.W.3d 325,

334 (Tenn. 2012). However, in *Hodge*, which Petitioner points to, the TSC clarified that TN. R. App. P. 27(b) limits such new issues to those in which the appellee is "seeking relief from the judgment" of the Court of Appeals. *Hodge*, 382 S.W.3d at 336 (Tenn. 2012). Petitioner cannot be claiming to seek relief from the judgment of the TCCA on his additional claims when no such judgment was made. *See Id.* Again, Petitioner has not demonstrated, and this Court cannot find, that the state court arbitrarily enforced these rules to find that Petitioner did not fairly present these claims.

Because Petitioner did not comply with various regularly-enforced state procedural rules, which are adequate and independent grounds, the claims he presented only in his pro se briefs are procedurally defaulted and may not now be addressed on the merits absent Petitioner's demonstration of cause and prejudice sufficient to excuse such default.

### B. Cause and Prejudice

Petitioner next contends that any procedural default is excused for cause; specifically, he alleges as cause: (1) the ineffective assistance of post-conviction counsel; (2) state court action or inaction, including the arbitrary application of procedural law; (3) the respondent's continued failure to disclose exculpatory information; and (4) that equitable principles, as well as the due process clause of the 14th Amendment and/or 6th Amendment demand that this Court can and should hear critical constitutional claims [Doc. 2 at 3 – 11]. None of these are sufficient cause to excuse Petitioner's procedural default, and his defaulted claims will not be reviewed on their merits.

The Courts have carved out a narrow set of circumstances in which procedural default may be excused and defaulted claims may be evaluated on their merits. Procedurally barred claims may be considered on their "merits only if the petitioner establishes (1) cause for his failure to

comply with the state procedural rule and actual prejudice from the alleged violation of federal law or (2) demonstrates that his is 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Wallace*, 570 Fed. Appx. at 452 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)"; *see House v. Bell*, 547 U.S. 518, 536 (2006). To show sufficient "cause," Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488. Where petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

In order to warrant review under the "actual innocence" prong, which is reserved for fundamental miscarriages of justice, a habeas petitioner must demonstrate that a constitutional error resulted in the conviction of one who is "actually innocent." *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A habeas petitioner asserting a claim of actual innocence must establish that in light of new, reliable evidence – either eyewitness accounts, physical evidence, or exculpatory scientific evidence – that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *House*, 547 U.S. 518, 536 (2006) (citing *Schlup v. Delo* , 513 U.S. 298, 327 (1995)).

### 1. Ineffective Assistance of Counsel as Cause

Petitioner alleges the ineffectiveness of post-conviction counsel as a ground on which to excuse the procedural default of his ineffective assistance of trial counsel and ineffective assistance of counsel on motion for new trial and appellate counsel claims.

Ordinarily, there is "no constitutional right to an attorney in state post-conviction proceedings," so ineffective assistance in post-conviction proceedings does not qualify as "cause"

to excuse procedural default of constitutional claims. *Coleman v. Thompson*, 501 U.S. 722, 725, 755 (1991). However, the Supreme Court has carved out an exception to this rule for claims of ineffective assistance of counsel when those claims may be raised for the first time in post-conviction proceedings or "where a state procedural framework… makes it highly unlikely… that a defendant [had] a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012)). This exception applies in Tennessee. *See Sutton v. Carpenter*, 745 F.3d 787, 795 – 96 (6th Cir. 2014).

However, claims of ineffectiveness of post-conviction *appellate* counsel cannot constitute cause to excuse procedural default because it is not an initial-review collateral proceeding. *Martinez*, 132 S. Ct. at 1320.

> Although *Martinez* and *Trevino* expanded the class of cases in which a petitioner can establish cause to excuse the procedural default of ineffective-assistance claims, the Supreme Court cautioned that the rule 'does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial.'

*Wallace*, 570 Fed. Appx. at 453 *(quoting Martinez*, 132 S. Ct. at 1320). The Sixth Circuit has only applied the *Martinez* exception to claims of ineffective assistance of counsel, and declined to apply it to suppressed evidence, prosecutorial misconduct, trial error, ineffective assistance of appellate counsel, and cumulative error. *See Abdur-Rahman v. Carpenter*, 805 F.3d 710, 714, 716 (6th Cir. 2015).[7]

Petitioner's procedural default relates to his abandonment on appeal of the claims he now raises, which were previously raised at the post-conviction trial court level. The ineffective

---

[7] The Supreme Court likewise reiterated in *Davila v. Davis*, 137 S.Ct. 2058, 2062 (2017) that the *Martinez* exception does not extend beyond claims of ineffective assistance of trial counsel, and specifically declined to apply it to ineffective assistance of appellate counsel.

assistance of counsel at the post-conviction trial level cannot logically constitute cause for this procedural default. The *Martinez* exception applies to ineffective assistance of counsel claims which were not able to be pursued on direct appeal, and due to the ineffective assistance of counsel, were not properly raised at the initial-review collateral proceeding. *Martinez*, 132 S.Ct. at 1309; *see also Wallace*, 570 Fed. Appx. at 453. Here, Petitioner's claims were in fact raised at the initial-review post-conviction proceeding and the ineffective assistance of post-conviction counsel on appeal cannot excuse default. Petitioner expressly notes in his reply that he did not raise "the application of *Martinez* to post-conviction appellate counsel" [Doc. 30 at22 ¶ 3].[8] Regardless of Petitioner's intent, *Wallace* makes it clear that the *Martinez* exception does not apply to post-conviction appellate counsel. *Wallace*, 570 Fed. Appx. at 453. Petitioner has not established cause for which to excuse his procedural default under this theory.

### 2. State Court Inaction or Arbitrary Application of Law

Petitioner asserts inaction of the state courts as cause to excuse procedural default, stating "the Supreme Court has long found state action and/or inaction of the state courts as being cause to excuse [procedural default]" [Doc. 2 at 7]. Petitioner does not elaborate on this except to cite to a myriad of cases, many of which are not jurisdictionally appropriate, and most of which relate to the prosecution's suppression of exculpatory evidence [Doc. 2 at 7 – 8]. Petitioner does not alert the Court to any facts demonstrating how in this instance the state court would be responsible for any such withholding. Petitioner later alleges the following of the state court's behavior:

> The Tennessee Courts further, through essentially a sham post-conviction process, failed to apply, simply fabricated, arbitrarily applied and/or simply ignored facts, interpretations and application of state and federal evidentiary, procedural and governing law, i.e. law of the case doctrine, conflict of interest relative post-conviction appellate attorneys, pro se representation and/or waiver and previous

---

[8] Petitioner does argue other claims regarding the performance and decision-making of his post-conviction appellate counsel, but rather than framing them as ineffective assistance of counsel claims raises that her actions were such that equity demands this Court to address Petitioner's procedurally defaulted claims.

> determination, proper standards of review, concessions and objections on proof, cumulative error review, and/or de novo review etc., as well as that relative other positions set forth therein, in order to deny claims and/or otherwise procedurally entrap the Petitioner.

[Doc. 2 at 11]. This is a lengthy and weighty set of accusations against the state courts, yet Petitioner offers essentially no facts under which to evaluate these claims. The only actions, or inactions, Petitioner seemingly points to on behalf of the state courts are the court's denial of post-conviction appellate counsel's Motion to Withdraw as Counsel and denials of additional briefing.

As stated above, after significant disagreement between post-conviction appellate counsel and Petitioner on how to proceed, counsel attempted to withdraw from her representation of Petitioner, which the State did not oppose [Doc. 1 Attachments 1, 3, and 5]. Although criminal defendants do have a right to self-representation under 28 U.S.C. § 1654, courts have broad authority over who practices before them and are not required to permit hybrid representation, representation both pro se and by counsel. *United States v. Mosely*, 810 F.2d 93, 98 (6th Cir. 1987). "When counsel has 'performed in a highly competent and professional manner' and the defendant has been 'given ample time to consult with his counsel over strategy,' it is not an abuse of a court's discretion to prohibit hybrid representation." *Miller v. United States*, 561 Fed. Appx. 485, 488 – 89 (6th Cir. 2014) (quoting *Mosely*, 810 F.2d at 98). In its order denying the motion to withdraw, the TCCA found that counsel had substantially invested in her appellate brief and in preparing for oral argument [Doc. 1 Attachment 4]. Because counsel had already filed briefs and prepared for this case and would in the future be responsible for oral argument, the court was not required to allow Petitioner "hybrid representation" and Petitioner cannot demonstrate cause for his procedural default. *See Id*. Moreover, even if the TCCA's action could constitute cause, it would be exceedingly difficult for Petitioner to prove prejudice for the TCCA's prohibition of

counsel's withdrawal, when counsel was in fact successful in having Petitioner's sentence vacated by the same court. *Kendrick*, 2013 Tenn. Crim. App. Lexis 539.

Regarding Petitioner's allegations that the TCCA's denial of additional briefing or a new briefing schedule constituted cause for his procedural default, again, the court holds broad discretion over whether to allow additional briefing. It is apparent that Petitioner was seeking to include his procedurally defaulted claims in his new brief and in some sense, the denial of additional briefing kept him from doing so. However, to demonstrate cause in this regard by clear and convincing evidence, Petitioner must show an external factor which "prevented him from raising the issue in his first appeal." *Murray*, 477 U.S. at 488. It was the decision of defense counsel, attributable to Petitioner, to winnow his claims and she did so on Petitioner's third trip through the TCCA. The court was not required to permit additional briefing, in an already long and procedurally complex case, to counteract the defense's decision and this will not constitute cause to excuse Petitioner's procedural default.

### 3. Respondent's Failure to Disclose Exculpatory Information

Petitioner also relies on the "continued failure of the Respondent to disclose… exculpatory evidence" as cause to excuse his procedural default [Doc. 2 at 10]. Presumably, Petitioner relies on this ground to excuse his procedural default of his "prosecution suppression" claims.

Prosecution suppression can serve as a ground to excuse procedural default when the ongoing suppression sufficiently frustrates a petitioner's ability to bring the claim and the cumulative effect of the suppressed evidence was reasonably likely to have produced a different result. *See Kyles v. Whitley*, 514 U.S. 419 (1995). However, as clarified above, Petitioner's claims are procedurally defaulted because he failed to raise them on appeal; he was, however, able to raise these claims at the trial court level. While prosecution suppression may provide cause in some

cases, it does not logically follow that a Petitioner who did successfully raise his claims at the trial court level was impeded by the prosecution from raising his claims on appeal. Further, Petitioner has not established the factual basis for his claim that the prosecution did suppress substantial cumulative evidence by clear and convincing evidence. Petitioner has not established cause to excuse his procedural default.

### 4. Equitable Principles

Lastly, Petitioner argues that equitable principles, as well as Due Process, requires this Court to hear critical constitutional claims [Doc. 2 at4]. Under this theme, and given the leniency granted to pro se petitioners, Petitioner appears to raise two issues for which to find cause: (1) that he was extraordinarily prevented from raising his claims due to the actions of post-conviction appellate counsel, and (2) that he is actually innocent [Doc. 2 at 4 – 6, 9 – 10].[9]

Petitioner notes that he does not raise the actions of post-conviction appellate counsel as ineffective assistance of counsel[10], rather he attempts to frame her actions as subjecting him to a "particular injustice" which warrants court intervention [Id.]. Specifically, Petitioner argues that post-conviction appellate counsel had a conflict of interest due to representation of another client in a time-consuming case, such that she effectively abandoned of Petitioner and ceased to be his agent, and that she, along with Respondent and the state court, actively misled Petitioner regarding the raising of his claims [Id.].[11] These claims are seemingly related to counsel's decision to winnow Petitioner's claims on appeal and the court's resulting decision to treat them as abandoned.

---

[9] To the extent that he is instead attempting to state that this Court should circumvent the recognized rules established by the Supreme Court regarding habeas petitions in order to hear his claims, such an action is beyond the purview of this Court.

[10] As set forth above, this claim would not provide cause to excuse his procedural default. *Wallace*, 570 Fed. Appx. at 453.

[11] Although Petitioner claims he was actively misled, the record and Petitioner's own actions belie this allegation. Petitioner's intent to have counsel removed based on her waiver of his claims and continued requests for additional briefing demonstrate that he was likely well aware that his claims had been abandoned on appeal.

While Petitioner does point to *Maples v. Thomas*, which holds that procedural default may be excused when counsel has actually abandoned petitioner, Petitioner has not demonstrated by clear and convincing evidence that counsel actually or effectively abandoned him where she filed a timely, thorough 83-page brief on his behalf and is not alleged to have missed court appearances or been otherwise unprepared. *See Maples v. Thomas*, 565 U.S. 266 (2012). This Court declines to hold that counsel's professional judgment that her client would be better served by winnowing his claims constitutes abandonment in this context. *See Jones v. Barnes*, 463 U.S. 745 (1983).

Second, Petitioner cites to *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), which recognizes "actual innocence as a gateway through which a petitioner may pass whether the impediment is a procedural bar or expiration of a limitations period" [Doc. 2 at6]. This Court assumes that by doing so Petitioner is suggesting that his new evidence claims should be admitted under the "fundamental miscarriage of justice" exception to procedural default. *Dretke*, 541 U.S. at 388. Petitioner raises two claims of new evidence: (1) new scientific evidence of actual innocence regarding evidence of the common fire control mechanism's ability to accidentally discharge, and (2) evidence that the Petitioner was denied his 14th Amendment Right to Due Process because the post-conviction process discriminates against "Afro American" petitioners [Doc. 1].

A habeas petitioner asserting a claim of actual innocence must establish that "in light of new [credible] evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. The Court must determine whether Petitioner has shown actual innocence, by clear and convincing evidence, such that his conviction represents a "fundamental miscarriage of justice." *See Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). Here, the Court is concerned with "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Petitioner first alleges that the evidence adduced at post-conviction hearings by Mr. Belk is new scientific evidence of his actual evidence [Doc. 1]. While Petitioner did raise new evidence, which was not raised at trial, and there are no issues alleged regarding the reliability of this evidence, Petitioner cannot show that no reasonable juror would have found him guilty beyond a reasonable doubt if provided with Mr. Belk's testimony. *See House*, 547 U.S. at 536. Mr. Belk's testimony that the common fire control mechanism was defective in design did not definitively establish that Petitioner's gun discharged without a trigger pull; he merely suggested that it was possible. Even given this information, the jury would have had to believe the testimony of Petitioner that accidental discharge is factually what happened, and discredit the contradicting proof presented by Agent Fite and even the testimony of Mr. Belk that he was not able to induce Petitioner's rifle to fire without a trigger pull. Both credibility determinations and determinations of value are questions for the jury and this Court will not now speculate that no reasonable juror could have found the State's evidence more credible than the testimony of Mr. Belk. *See United States v. Griffin*, 382 F.2d 823, 829 (6th Cir. 1967).

With regards to Petitioner's second new-evidence claim, the Court finds that even if Petitioner's information regarding systematic discrimination in the post-conviction process was determined to be "new evidence" and presented to be reliable, this would not be evidence of Petitioner's factual innocence. In other words, Petitioner could not show that because some habeas petitioners face discrimination within the justice system, that no reasonable juror could have found him guilty beyond a reasonable doubt.

Petitioner has failed to establish cause to excuse procedural default on this ground or any other and his procedurally defaulted claims will not now be considered on their merits. Accordingly, only Petitioner's non-defaulted claims will be discussed in turn.

### C.  Merits Analysis

If a claim is exhausted before the state courts, and not procedurally defaulted, the federal court may then evaluate the merits.   Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C.  §2254, *et.  seq.,* a district court may not grant habeas corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2).  This standard is "intentionally difficult to meet."  *Woods*, 135 S. Ct. at 1376 (quotation marks omitted).

"A state court's decision is 'contrary to' clearly established law 'if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts."  *Wallace*, 570 Fed.  Appx. at 450 (quoting *Williams*, 529 U.S. at 413).   Under the "unreasonable application clause," the proper inquiry is whether the state court's decision was "objectively unreasonable," and not simply erroneous or incorrect.  *Williams*, 529 U.S. at 409 – 11.  As to a claim that the state court's decision was based on an unreasonable determination of the facts, the AEDPA requires heightened respect for state factual findings.  *Herbert v.  Billy*, 160 F.3d 1131, 1134 (6th Cir.  1998).  Where the record supports the state court's findings of fact, those findings are presumed to be correct unless rebutted by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).

All of Petitioner's remaining claims are based on the ineffective assistance of trial or appellate counsel. The Sixth Amendment entitles criminal defendants to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish that counsel's assistance was constitutionally ineffective, a defendant must prove (1) that counsel's performance was sufficiently deficient that he was no longer "functioning as the 'counsel' guaranteed under the Sixth Amendment[,]" and (2) that his "deficient performance prejudiced the defense… so as to deprive the defendant of a fair trial" and undermined the reliability of trial results. *Id.* To prove deficiency, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To prove prejudice, the defendant must show that he has been prejudiced by his counsel's deficiencies by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Supreme Court has clarified that when a federal court reviews a state court's application of *Strickland*, which sets its own high bar for claims, "establishing that a state court's application was unreasonable under §2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "In those circumstances, the question before the habeas court is 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Id.*; *see Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .").

### 1. Weapons Expert Testimony

Petitioner alleges that his trial counsel was ineffective for failing to adduce expert testimony relating to a defective firing mechanism design, present in Petitioner's rifle, that could

have caused the gun to discharge accidentally [Doc. 3 at6 – 25]. Respondent contends that trial counsel was not ineffective because he did plan and employ tactics to introduce evidence on this point and to controvert the evidence offered by the State [Doc. 15 at20 – 23]. The Court finds that trial counsel was not ineffective in this respect.

The central theory of the defense was that the Petitioner's rifle malfunctioned and fired without Petitioner pulling the trigger. The State presented a firearms expert, Agent Fite, who stated that after testing Petitioner's rifle he concluded that the gun could not possibly fire without the trigger being pulled or the gun being broken [Doc. 14 Attachment 60 at13]. Trial counsel attempted to counter this testimony by first, discrediting Agent Fite as someone who believed himself infallible and second, by attempting to cross-examine Agent Fite on issues present with the Remington Model 742, a precursor to Petitioner's rifle, although the trial court prohibited this line of questioning. *Kendrick*, 454 S.W.3d at 475 – 476.

At post-conviction, trial counsel conceded that he did not interview the State's firearms expert prior to trial and did not recall conducting any legal or factual investigation into the gun's propensity to fire without the trigger being pulled and did not look for an expert on this matter. *Id*. at 476. Instead, counsel planned to rely on the expected testimony of Officer Steve Miller to contradict the proof presented by the State. *Id*. at 477. Officer Miller testified that he retrieved the rifle from where Petitioner had thrown it and, when later removing the gun from the trunk of his police vehicle, shot himself in the foot. *Id*. Before trial, Officer Miller made definitive statements that his finger was not on the trigger, but at trial testified that he could not recall where his finger had been, although he did physically demonstrate how he believed himself to be holding the gun, notably without his finger on the trigger, and stated that officers are thoroughly trained to not touch triggers of weapons they are not intending to shoot. *Id*.

At the post-conviction hearings, Petitioner presented the testimony of Henry Belk, Jr., a firearms expert who testified that the common fire control mechanism, a trigger mechanism in the Remington 7400 model weapon in question, had malfunctioned in several cases and caused guns to fire without the trigger being pulled. *Id*. at 464. Mr. Belk testified that he first became aware of the problem in 1970, but did not first serve as an expert on this issue until 1994, and had since provided expert testimony in several courts regarding this defect, both in Remington 7400 models and other models containing the defective mechanism. *Id*. He also testified that he had been unable to cause Petitioner's rifle to malfunction. *Id*. Still, the post-conviction trial court noted that his testimony would have lent credence to Petitioner's case at trial. *Id*. at 476.

On Petitioner's second appeal of the denial of his post-conviction petition, the TCCA reversed the post-conviction trial court's holding on this issue. *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539. The TCCA found that trial counsel's performance fell "below an objective standard of reasonableness when trial counsel failed to adduce expert testimony about the rifle's defective trigger mechanism, which was known to cause accidental shootings, to rebut the State's expert testimony that the rifle could only be fired by pulling the trigger[.]" *Kendrick*, 454 S.W.3d at 476 (citing *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539). The TCCA found this issue prejudicial, particularly because they found that it was reasonably likely that the jury would have convicted Petitioner of a lesser degree of homicide, which satisfied the test for prejudice. *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539 at *51.

The TSC, however, later reversed the TCCA's holding, finding that counsel's decision to "construct his 'accidental firing' defense" around anticipated testimony from Officer Miller claiming that the specific gun in question did actually accidentally discharge was reasonable. *Kendrick*, 454 S.W.3d at 477. The TSC went through a lengthy analysis of both *Harrington* and

*Hinton,* each of which apply the *Strickland* test for ineffective assistance of counsel. *Kendrick v. State*, 454 S.W.3d at 468 – 475(analyzing *Harrington*, 562 U.S. 86; *Hinton v. Alabama*, 571 U.S. 263 (2014); *Strickland* 466 U.S. 668). The court notes that *Harrington* held that defense counsel was not deficient for failing to hire expert testimony, even though such testimony may have been useful, when counsel had a reasonable strategic reason for doing so and took other measures to counteract the State's evidence. *Id.* Notably here, the court points out that in *Harrington,* counsel's defense strategy not working as well as planned does not prove counsel incompetent. *Id.*

The court then discussed *Hinton* which found that in some cases, the defense strategy relies on expert evidence and hiring one will be necessary. *Id.* However, the court notes that even in *Hinton*, counsel was held deficient for failing to appropriately research his ability to hire an expert, not for failing to hire an expert. *Id.* The TSC found that "[d]espite Sergeant Miller's memory lapse, defense counsel's performance on this issue indicated 'active and capable advocacy,'" under *Harrington v. Richter*, because at the time counsel was forming his trial strategy it was reasonable to rely on this testimony, which was "not speculative[] and… did not involve other weapons" to refute Agent Fite and cast reasonable doubt on Petitioner's guilt. *Id.* at 477. The TSC further stated that while it was likely best practice for trial counsel to seek out expert proof, failing to do so was not objectively unreasonable when the defense did not hinge on expert proof. *Id.* Additionally, the TSC pointed out that although Mr. Belk's testimony may have been helpful, it is doubtful that in 1994 counsel would have been given permission to hire an expert,[12] that it remained unclear whether Mr. Belk could have been found at the time of Petitioner's trial, and

_____

[12] Tennessee did not recognize until 1995 "that indigent non-capital criminal defendants had a constitutional right to expert psychiatric assistance," and even then it was limited to psychiatric experts. *Kendrick v. State*, 454 S.W.3d 450, 476 (Tenn. 2015) (citing *State v. Barnett*, 909 S.W.2d at 430 n.7).

lastly that even if Mr. Belk had been called, his testimony would not have been as useful when he had not yet testified about the three instances of the 7400 model rifle misfiring. *Id*. at 476.

The Court cannot find that the TSC unreasonably applied federal law on this claim. The TSC reasonably applied *Harrington* and *Hinton* to find that counsel was not constitutionally deficient, because he had a reasonable strategy to introduce proof regarding Petitioner's rifle's capacity for accidental discharge and did attempt to undermine the expert proof presented by the State. Petitioner has also not demonstrated by clear and convincing evidence that Mr. Belk's testimony could have been found at the time of his trial. Because the case here did not rely solely on expert testimony where the State presented much additional evidence, including eyewitness testimony, counsel was not ineffective for failing to hire an expert. While Mr. Belk's testimony would certainly have been useful at trial, this Court does not find that it was unreasonable for the TSC to conclude counsel was not deficient for failing to raise it. Petitioner is therefore not entitled to §2254 relief on this claim.

### 2. Excited Utterances Exception for Officer Miller's Testimony

Petitioner claims that trial counsel was ineffective for failing to utilize the Tennessee Rule of Evidence regarding excited utterance hearsay exceptions to introduce the prior statements of Officer Steve Miller [Doc. 3 at25 – 40].[13] Respondent contends that even if Officer Miller's statements were excited utterances, it does not necessarily follow that counsel was ineffective for failing to introduce them under this theory [Doc. 15, at 23]. Because counsel was thorough in his attempts to introduce Officer Miller's prior statements and impeach the witness, counsel's representation at trial was not deficient.

---

[13] Petitioner also claims that this is in violation of the Sixth Amendment right to present a defense and a violation of the confrontation clause, however, those claims are amongst those procedurally defaulted, and will not be considered.

When attempting to remove Petitioner's rifle from the trunk of his vehicle, Officer Steve Miller shot himself in the foot. *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539, at *16. After the accident, Officer Miller made statements to Officers Holbrook, Sims, and Gann that he knew his finger was not near the trigger when the gun discharged. *Id*. at *16 – 20. However, at trial, Officer Miller testified that he could not recall where his finger was. *Id*. at *39 – 40. On cross-examination, trial counsel attempted to elicit from Officer Miller that his finger was not on the trigger. *Kendrick*, 454 S.W.3d at 460 – 461. While Officer Miller never used those words, and his answers did seem less than cooperative, trial counsel had him demonstrate how he recalled picking up the gun, where Officer Miller demonstrated that his finger was not near the trigger. *Id*. Counsel also led Officer Miller to concede that he knew the weapon was likely loaded, and had been trained for many years to not pick up any gun with his finger near the trigger, much less a loaded one. *Id*. Trial counsel also attempted to introduce Officer Miller's prior statements under the "prior inconsistent statements" rule, although the trial court did not allow him to do so. *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539, at *9 – 12.

Petitioner contends that because Officer Miller's statements were made while "under the stresses-pain of the event … [and] bear their own indicia of reliability," they could have been introduced under the excited utterances exception to hearsay and "been used as truth of the matter asserted" [Doc. 3 at 26]. He claims that failure to include this information was prejudicial because the statement that Officer Miller's hands were nowhere near the trigger was crucial for the defense [Doc. 3 at 27]. Because the theory of defense was accident, Petitioner contends that the gun had discharged without Petitioner's finger on the trigger and without any intent or action on his part, and the only evidence outside of Petitioner's word that could have controverted the proof of the State's expert were the words of Officer Miller [Doc. 3 at 27].

Both the TCCA and TSC addressed this claim. On his second appeal of the dismissal of his post-conviction petition, the TCCA found that trial counsel's performance fell below an objective standard of reasonableness when he failed to seek the admission of Officer Miller's statements under the excited utterance hearsay exception. *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539, at *50. They found that this error was prejudicial as it was reasonably likely that given this statement, the jury would have convicted Petitioner of a lesser degree of homicide. *Kendrick*, 2013 Tenn. Crim. App. LEXIS 539, at *50. Accordingly, the TCCA used this as the second ground on which to reverse the holding of the post-conviction trial court and vacate Petitioner's sentence. *Id*.

However, the TSC reversed, concluding that although the statements may have been admissible under excited utterance doctrine, Petitioner could not establish that trial counsel was deficient for failing to admit them under this rule because counsel took several alternative measures to demonstrate that Officer Miller had not pulled the trigger. *Kendrick*, 454 S.W.3d, 480 – 81. The court noted that, in this context, the question was not whether the statements were admissible, but rather whether counsel was objectively unreasonable under *Strickland*, given the presumption that counsel was adequate. *Id*. at 480 (citing *Strickland*, 466 U.S. at 688 and *Mobley*, 397 S.W.3d at 80 – 81). The court found that while in some circumstances the "lack of familiarity with court rules may provide grounds for a finding of ineffective assistance of counsel," here, counsel closely cross-examined Officer Miller, attempted to refresh his memory, attempted to use the incident reports to impeach his testimony,[14] emphasized during both cross-examination and closing argument that Officer Miller's finger was not near the trigger when he demonstrated his own posturing with the rifle, and elicited from Officer Miller that he was unlikely to pick up a rifle with

---

[14] The TSC noted that these attempts failed due to the trial court's error, not counsel's.

his finger on the trigger, due to his training. *Id*. at 480 – 481. The TSC found that Petitioner being able to point to one tactic counsel did not employ to introduce this evidence would not overcome the presumption that counsel's representation was adequate. *Id*. at 481. The TSC further clarified that even if it had found deficiency by counsel, there was such sufficient other evidence, both for the defense and the prosecution, that it could not determine that this one deficiency would undermine confidence in the verdict. *Id*. at 481 (citing *Strickland*, 466 U.S. at 694).

As with all issues of ineffective assistance of counsel on habeas, there is double deference here. *Harrington*, 562 U.S. at 105. The Court presumes both that counsel's representation was adequate and that the court's finding of such is reasonable. *Id*. Even if Officer Miller's statements were admissible under the excited utterances exception, such failure on behalf of trial counsel must be weighed against the many other actions counsel took to introduce this same testimony. Claims of ineffective assistance of counsel are reserved for those errors so clear and egregious that counsel was no longer functioning as guaranteed under the Sixth Amendment. *Strickland*, 466 U.S. at 687. As detailed above, counsel took painstaking measures to introduce this important defense evidence to the jury and to undermine the proof adduced by the State. Petitioner cannot then show that counsel deficiently served his adversarial function, for failing to use one tactic, such that the results of trial are undermined. *See Id*. The Court does not find that the state courts unreasonably applied federal law to this claim; therefore, Petitioner is not entitled to §2254 relief on this claim.

### 3. Prior Convictions

Petitioner contends that counsel was ineffective because he "opened the door" to Petitioner's prior convictions, which were otherwise inadmissible, and failed to request a limiting instruction after having done so [Doc. 3 at 40 – 46]. Respondent holds out that although this was likely error on behalf of trial counsel, Petitioner cannot establish prejudice [Doc. 15 at 35 – 39].

At trial, counsel questioned Petitioner regarding his criminal history. He asked Petitioner:

> Q. Do you have any history of violent crime?
> A. No, sir.
> Q. I almost forgot – do you have any history of any convictions for any kind
> of crime?
> A. Returned checks.

*Kendrick v. State*, No. E2011-02367-CCA-R3-PC, 2015 Tenn. Crim. App. LEXIS 887, at *68.

Before trial, counsel had prepared Petitioner for his testimony and told Petitioner that only his

conviction for writing bad checks was admissible. *Id*. Then on cross-examination, the State asked

Petitioner about an additional conviction for driving under the influence, which Petitioner admitted

to, as well as a conviction for possession of marijuana arising from the same incident. *Id*. at *69.

The State through cross-examination also established for the jury that as a result of these

convictions, Petitioner was driving without a valid driver's license the night of the shooting. *Id*.

Trial counsel objected to this line of questioning but was overruled by the trial court. *Id*. Petitioner

likewise complained about the trial court's allowance of this line of questioning on direct appeal,

but the TCCA held that trial counsel "opened the door" to this type of impeachment given the form

of his question and Petitioner's response regarding only some of his prior convictions. *Id*. at *69

– 70.

Petitioner raised this issue on post-conviction as an ineffective assistance of counsel claim,

both for opening the door to the prior convictions and failing to request a limiting instruction after

doing so [Doc. 3 at 40 – 46]. The TCCA held that although counsel was deficient with regards to

the form of the question and should have requested a limiting instruction, it agreed with the post-

conviction court that these errors did not prejudice Petitioner. *Id*. at *71. The TCCA noted that

trial counsel attempted to limit the damage during closing arguments by explaining that the

convictions do not contribute to Petitioner's honesty and truthfulness and alerting the jury to the

fact that Petitioner actually volunteered testimony about an additional charge. *Id*. at \*71 – 72. Additionally, the TCCA found that Petitioner's defense did not rely solely on his own credibility, rather it was better supported by the fact that Officer Miller also had an incident with the same rifle that strongly indicated the rifle misfired. *Id*. at \*72. Citing *Strickland*, the TCCA held that because there was substantial other evidence against Petitioner, including eyewitness testimony, the TCCA could not find that there was a reasonable possibility but for this error that the result of the proceeding would have been different. *Id*. at \*75.

The Court cannot find that the TCCA unreasonably applied *Strickland* with regard to this error and Petitioner is not entitled to relief on this claim. While Petitioner correctly points to case law that finds that counsel may be deficient for introducing inadmissible prior convictions, here the state court did not find that counsel was not deficient, but rather that petitioner was not sufficiently prejudiced by counsel's error. *See Byrd v. Trombley*, 352 Fed. Appx. 6 (6th Cir. 2009). Petitioner must show more than that counsel's error has "some conceivable effect on the outcome," he must show that but for counsel's error, it is reasonably likely that the outcome may have been different. *Strickland*, 466 U.S. at 694. The TCCA held that although Petitioner's credibility may have been damaged, neither his defense, nor the prosecution, relied only on his credibility or lack thereof. *See Byrd*, 352 Fed. Appx. 6. There was ample evidence in this case, both for and against Petitioner, that did not turn on Petitioner's credibility and the Court cannot find that there was no reasonable basis on which the state court could determine that Petitioner was not sufficiently prejudiced to undermine the reliability of the results of his trial. *See Harrington*, 562 U.S. at 105.

### 4. Testimony of Martha Maston

Petitioner claims that trial counsel was deficient for failing to properly object, request curative instructions, or seek other curative measures in relation to the prosecution's use of Martha

Maston as a rebuttal witness, without having provided notice, and for failing to offer surrebuttal to Ms. Maston's testimony [Doc. 3 at 46 – 59].

At trial the prosecution called Martha Maston, an airport security officer, to testify. *Kendrick*, 2015 Tenn. Crim. App. LEXIS 887, at *100. Ms. Maston attested that she arrived at the scene and removed Petitioner's children from their car seats and when she did Petitioner's four-year old daughter wrapped her arms around Maston's neck and while crying said that she "told daddy not to shoot mommy but he did and she fell." *Id*.

Petitioner complains that counsel did not properly object or request curative measures regarding: (1) that he was not provided notice of Ms. Maston's testimony in violation of the parties' open file policy agreement and (2) that her testimony was offered in rebuttal. He also alleges that counsel was deficient for failing to raise surrebuttal testimony on this point [Doc. 3 at 46 – 59].[15] Under these complaints, Petitioner appears to argue not that counsel did not object to this testimony, which would be factually incorrect, but instead argues that counsel's ineffectiveness was undergirded by a misunderstanding of the law that led counsel to incorrectly and ineffectively challenge this testimony [*Id*.]. He argues that counsel demonstrated a misunderstanding of the law when he: attempted to claim that the testimony did not fall within the excited utterances hearsay exception, argued that the testimony was not proper rebuttal, argued the prejudice presented by the testimony and not the prejudice created by the lack of notice, and suggested to the jury that they could discredit this testimony without the court offering a similar instruction. Petitioner further submits that trial counsel was ineffective for failing to move for various curative measures, particularly "specific performance of the prosecution's twenty-two year plea offer" [*Id*.].

---

[15] Petitioner also attempts to raise that this testimony was brought after a violation of the sequestration order, but that claim is among his procedurally defaulted claims and will not be considered here.

Regarding the "surprise" nature of Ms. Maston's testimony, the TCCA on direct appeal found that Petitioner was not prejudiced by the late notice, that the State was not granted undue advantage, and that because Ms. Maston's testimony had been discovered late, the State had not acted in bad faith. *Kendricks*, 947 S.W.2d at 883. The TCCA agreed with Petitioner, however, that Maston should have been called as part of the State's case-in-chief and not in rebuttal, yet still found that Petitioner was not prejudiced by the order in which Ms. Maston's testimony was adduced. *Id*. Finally, the court determined that because this testimony should have been part of the State's case-in-chief, no limiting instruction regarding the use of this testimony was needed. *Id*. On post-conviction appeal, the TCCA held that the issues regarding Martha Maston's testimony had been addressed on direct appeal, and were therefore not the proper subject for post-conviction relief. *Kendrick*, 2015 Tenn. Crim. App. LEXIS 887, at *103.

The TCCA went on to note that although Petitioner alleges that trial counsel was deficient for failing to request the State be ordered to execute specific performance of the plea agreement for the violation of the open-file agreement, Petitioner pointed to no case law, and the court found none, "where specific performance of a rejected plea offer was ordered following a breach of the prosecution's open-file discovery agreement." *Id*. at *104. The TCCA also determined that the post-conviction court had credited trial counsel's testimony that the statement of Petitioner's daughter was "ambiguous and not necessarily inconsistent with a theory of accident," and thus declined to reweigh or reevaluate this issue to establish prejudice. *Id*.

The TCCA also found that Petitioner appears to argue that trial counsel should have called him to testify to contradict Ms. Maston's testimony and minimize the damage done by her statement. *Id*. at *104 – 105. However, it determined the testimony given by Petitioner's daughter was already questionable and Petitioner had already contradicted her statements with his own

testimony. *Id*. at 105. The TCCA found that they could not say that trial counsel was deficient for failing to call Petitioner to testify to a "fairly innocuous statement in surrebuttal." *Id*.

Petitioner points to state cases pertinent to the principle that Tennessee disfavors "surprise" witnesses [Doc. 3 at 49]. However, the question before us is whether there is any reasonable argument by which the state court could have determined that trial counsel was not deficient in his handling of Ms. Maston's testimony. *See Harrington*, 562 U.S. at 105. The TCCA found that trial counsel did challenge the lack of notice of this testimony, but the court did not find prejudice resulting from Petitioner's lack of notice or the fact that Maston's testimony was characterized as rebuttal. Without more, the Court will not hold that counsel is objectively unreasonable, here, for making a losing argument.

Under the Tennessee Rules of Criminal Procedure, Petitioner was not entitled to discovery of the contents of Ms. Maston's expected statement and he fails to show how he was prejudiced by not knowing her identity. Tenn. R. Crim. P. 16(a)(2). He likewise fails to show how he was prejudiced by Ms. Maston's testimony being provided in rebuttal. When faced with the surprise witness, allowed by the court, counsel cross-examined her and sought to undermine her testimony. The Court will likewise not find that counsel was no longer functioning as counsel within the adversarial process for failing to request an order for specific performance of the plea deal. Petitioner points to no case law ordering such performance for a breach of open file policy and counsel is not deficient for failing to file a motion or assert a claim which has no merit. *See O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007). Because counsel was not deficient and Petitioner has not demonstrated prejudice, he is not entitled to relief on this claim.

### 5. Testimony of Lennell Shepheard

Petitioner argues that trial counsel was ineffective for failing to object to Lennell Shepheard's testimony as a discovery violation, failing to impeach Shepheard, and failing to object to Shepheard's reference of information outside the record or request a limiting instruction regarding the testimony of Lennell Shepheard [Doc. 3 at 67 – 75]. The Court finds that trial counsel was not ineffective.

At trial, Lennell Shepheard, an eyewitness who was acquainted with the victim through their respective jobs, testified that after hearing the gunshot, he looked outside and saw Petitioner standing over the victim's body shouting "I told you so" roughly six times. *Kendrick*, 2015 Tenn. Crim. App. LEXIS 887, at *76. Mr. Shepheard's previous statements provided in discovery did not contain this "I told you so" language. *Id*. Mr. Shepheard then stated that he made eye contact with the Petitioner and saw the Petitioner reach for the rear passenger-side car door as if to go for the rifle inside. *Id*. Trial counsel cross-examined Mr. Shepheard on these statements and elicited Mr. Shepheard's agreement that during a conversation prior to trial, Mr. Shepheard did not tell trial counsel about any threats and stated that he did not view any aggressive behavior, that the victim was not in fear of the Petitioner, and that he did not hear the couple arguing. *Id*. at 76 – 77.

Petitioner claims that Mr. Shepheard's change in testimony was a violation of the rules of discovery or the open file policy put into place by the parties and that trial counsel erred in failing to object or request curative measures [Doc. 3 at 67 – 75].[16] Trial counsel testified at post-conviction hearings that he had not been made aware of Mr. Shepheard's material change in testimony as he would have expected, given the open file agreement in place, and that the first

---

[16] Petitioner's claims regarding the "breach" of the open-file policy are discussed in section (IV)(C)(6) below, his claims regarding the discovery violations will be discussed here.

time he heard about Petitioner's "I told you so" statements was during the direct examination of Mr. Shepheard. *Id*. at 78.

The TCCA held that under the Tennessee Rules of Criminal Procedure, defendants are not entitled to the statements of state witnesses and that even if counsel had objected to his lack of notice with regards to this testimony, there is no guarantee that the trial court would have issued curative measures. *Id*. at *79. The court further noted that counsel thoroughly cross-examined Mr. Shepheard on this variation in testimony and ensured that the jury knew that the "I told you so" statement was not included in Mr. Shepheard's prior statements. *Id*. at *80. The court held that Petitioner did not demonstrate what more counsel could have done to discredit Mr. Shepheard had he been given more time. *Id*. at *81 – 82.

Petitioner next claims that trial counsel erred in not using Detective Mathis's interview of Lennell Shepheard, which was transcribed, to contradict the evidence offered by Shepheard at trial [Doc. 3 at 67 – 75]. Trial counsel attempted to read part of Mr. Shepheard's previous statement during cross-examination, presumably to highlight the inconsistencies between his trial testimony and the statements he made to Detective Mathis. *Id*. at *84. The State objected and claimed that the statements were "consistent," the trial court made no ruling, and defense counsel continued to read from the statement. *Id*. When directly asked, Mr. Shepheard said that he did tell Detective Mathis about the "I told you so" statement and counsel again tried to either impeach or "refresh Shepheard's memory" to which the State again objected. *Id*. at *84 – 85. During a bench conference on this issue, the trial court said that the failure to make a statement is not "inconsistent" to making that statement later and defense counsel said he would simply call Detective Mathis regarding the statement. *Id*. at *86. However, he never called Detective Mathis to testify on this point. *Id*. at *87.

On post-conviction, the TCCA points out first that trial counsel did attempt to impeach Mr. Shepheard with his prior statement, but was not allowed to by the trial court. *Id*. at *87 – 88. The TCCA found that even after this tactic was prohibited, counsel performed a thorough cross-examination and even noted the deficiencies with the testimony in his closing arguments. *Id*. at *88 – 90. Petitioner argues that counsel should have called Detective Mathis to contradict Shepheard and was ineffective for failing to do so, and also argues, in the alternative, that counsel should have obtained the Mathis report for impeachment purposes and was ineffective for failing to do so [Doc. 3 at 67 – 75]. However, the TCCA noted that Mathis was not even called to the post-conviction hearings and had still given no testimony. *Id*. at *88. It applied Tennessee law to clarify that it could not speculate on the potential contents of Mathis's testimony and whether it would have been favorable to petitioner and thus found that Petitioner had not established that trial counsel was deficient. *Id*. at *90 – 91. The TCCA then ruled that Detective Mathis's report was redundant given Detective Rawlston's testimony about the same information, and that counsel was not deficient for seeking it out. *Id*. at *90.

Finally, Petitioner complains that trial counsel erred when he did not object or request curative measures, including a limiting instruction, when Mr. Shepheard testified that he spoke to Investigator Legg, and testified to the substance of that conversation, when such was outside of evidence [Doc. 3 at 67 – 75]. At trial, Mr. Shepheard testified that he spoke to Mr. Legg, an investigator from the district attorney's office, roughly one week before trial and that he told Mr. Legg about the "I told you so" remarks. *Id*. at *93. Counsel did object based on the Jenck's Act, which requires the government to produce written reports on statements made by government witnesses, because the State had not provided any such statement to the defense. *Id*. at *94. Mr. Shepheard said that Mr. Legg took notes during his statement but he was not sure whether the

interview had been transcribed in writing or otherwise recorded. *Id.* Later, Investigator Legg testified outside of the jury's hearing that there were no written or recorded notations of his interview, which ended the discussion as the Jenck's Act was no longer applicable. *Id.* at *94 – 95.

Petitioner alleges that trial counsel was ineffective for failing to request a limiting instruction, instructing the jury that as a prior consistent statement, "the week-old statement [to Mr. Legg] could only be used in connection with credibility" [Doc. 3 at 67 – 75]. The TCCA held that Mr. Shepheard's testimony was a prior consistent statement and served permissible rehabilitation purposes, however, it also noted that the deficiencies with this statement, including the fact that it was only made one week before trial, were also made clear to the jury. *Id.* at *96 – 97.

The trial court did not issue specific jury instructions on prior consistent statements, but the jury did receive instructions on prior statements generally, outlining their impact on credibility and thus the weight the jury can give, or not give, to testimony. *Id.* at *97 – 99. The TCCA found that to hold that trial counsel's failure to request a limiting instruction on this matter was deficient would be impermissibly judging counsel's representation in hindsight. *Id.* at *99. The TCCA held that counsel was not deficient, because requesting this instruction could have emphasized the testimony, to the detriment of Petitioner, and counsel took many other measures to introduce the evidence that Mr. Shepheard's "I told you so" testimony was only delivered at the eleventh hour. *Id.*

To prevail on these claims, Petitioner would have to demonstrate that the State court's finding that counsel was not constitutionally ineffective, even given the deference granted to counsel's actions, was not simply incorrect, but objectively unreasonable. *Harrington*, 562 U.S. at 105. Mr. Shepheard's testimony did indeed raise many issues for the defense, both in its

unexpected nature and through the difficulties counsel faced in impeaching Mr. Shepheard. However, it is evident from the record that trial counsel diligently attempted to advocate for his client in this regard, even though many of his attempts were thwarted. As clarified above, counsel had no legal basis to argue a discovery violation based on this change in testimony, he diligently attempted to impeach even after an incorrect ruling by the court, and attempted to limit Mr. Shepheard's testimony and his credibility. The Court will not find that counsel failed to serve his adversarial role where he took extensive measures to introduce evidence and contradict the proof offered by the State merely because such attempts were unsuccessful. Petitioner is not entitled to relief under §2254(d) on this set of claims.

### 6. Bad Faith Use of Open File Policy

Petitioner alleges that both trial and appellate counsel were ineffective for failing to object or request curative measures, again including specific performance of the State's previous plea deal,[17] regarding the State's "bad faith" use of its open file policy, intended to induce him to waive his preliminary hearing, which he did, and to interfere with his trial [Doc. 3 at 59 – 67]. Petitioner claims that the State withheld the identity of Ms. Maston, whose name was not on the State's witness list, and the changes in the statements or expected testimony by Officer Miller and Mr. Shepheard, which led to the ineffective assistance of his counsel at trial, appeal, and during his plea deal, as counsel did not have all of the facts necessary to prepare for trial or to properly advise Petitioner on the favorability of the plea deal [*Id.*].[18] Petitioner argues that whenever evidence

---

[17] As discussed above, specific performance of a plea agreement has been used in Tennessee as a remedy, but Petitioner has not demonstrated that it has been used for a breach of open-file discovery.

[18] Petitioner likewise attempts to raise that the prosecution executed its open file policy in bad faith where it did not include "documentary x-ray and 7400 schematic evidence" but these are amongst his procedurally defaulted claims and will not be considered.

came in that was not included in the open file discovery, counsel should have moved for specific performance of the plea deal or other curative measures [Doc. 3 at 66].

As set forth above, on direct appeal, the TCCA concluded that Petitioner failed to show that he was prejudiced through the lack of disclosure of Maston as a witness because trial counsel was able to thoroughly cross-examine Ms. Maston and Petitioner did not indicate what more trial counsel could have done if he had known about her testimony earlier. *Kendricks*, 947 S.W.3d at 883. The TCCA also noted that it did not find bad faith or undue advantage on the State's part, because it credited the State's version of events that they did not know about Ms. Maston's potential testimony earlier. *Id*. at 884.

On post-conviction, the TCCA held that Petitioner had not pointed to any legal authority supporting that sanctions were required for the State's violation of the open-file policy. *Kendrick*, 2015 Tenn. Crim. App. LEXIS 887, at *79. The court, instead, applied Tennessee Rule of Criminal Procedure 16(d)(2), which provides that when a party fails to comply with discovery rules, the trial court has discretion to enter an order it deems just. *Id*. However, it also noted that Rule 16(a)(2) clarifies that statements made by state witnesses are not discoverable material. *Id*. The court cited a Tennessee case which held that even though a prosecutor had promised information and failure to supply it was "likely a breach of decorum," it was "not within the purview of the rules of procedure governing the practice of criminal law in Tennessee." *Id*. (citing *Matrin Becton v. State*, No. W2014-00177-CCA-R3-PC, 2015 Tenn. Crim. App. LEXIS 303, at *79 – 80.) With regards to the change in Mr. Shepheard's testimony not being disclosed to the defense before trial, the TCCA held that "[e]ven if trial counsel had objected to Mr. Shepheard's testimony on direct examination, there was no guarantee that the trial court would have issued any curative measures

at all." *Id.* at 80. Neither the TCCA or the TSC analyzed the changes in Officer Miller's testimony and counsel's effectiveness or ineffectiveness resulting from them under this framework.

Under the Tennessee Rules of Criminal Procedure, Petitioner was not entitled to the discovery of the statements of state witnesses or prospective witnesses. Tenn. R. Crim. P. Rule 16(a)(2). Although the state promised the entirety of its information, it is not a settled matter that the state courts would have sanctioned the State in any form for failing to provide it, particularly when these statements are not alleged to have been reduced to writing, and Tennessee jurisprudence seems to indicate they would not. *See Matrin Becton*, 2015 Tenn. Crim. App. LEXIS 303, at *79 – 80. Petitioner can show neither deficiency nor prejudice for counsel's failure to object to Petitioner not receiving information he was not legally entitled to. The Court cannot find that the state courts were unreasonable for failing to find counsel deficient for choosing not to make an argument with no clear basis in law. *See O'Hara*, 499 F.3d at 506. Petitioner additionally alleged prejudice because he claims he would have accepted the plea deal if given these pieces of State evidence. However, such prejudice would only be attributable to the State's withholding, not counsel where he likewise had no knowledge of the additional testimony that would be offered at trial. Even if counsel had objected, there was no legal basis, under similar facts, for reinstatement of the plea deal. For these reasons, the Court will not find that "there is [no] reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

### 7. Fifth Amendment Silence

Petitioner claims that counsel was ineffective for failing to object or request other curative measures for the prosecution's improper use of Petitioner's Fifth Amendment silence [Doc. 3 at 75 – 79]. Respondent holds out that Petitioner voluntarily agreed to speak with Detective

Rawlston, which the detective was properly permitted to comment on, and that neither trial nor appellate counsel should be faulted for failing to bring a meritless claim [Doc. 15 at 55 – 60]. Neither trial nor appellate counsel were deficient on this issue.

On cross-examination, trial counsel attempted to elicit testimony from Detective Rawlston to suggest that the detective performed an inadequate and less than thorough investigation because he made up his mind on the scene about what had occurred. *Kendrick*, 2015 Tenn. Crim. App. 887, at *110. He asked Detective Rawlston whether he ever considered if the Petitioner's rifle was fired or discharged accidentally, and the Detective said no. *Id*. After which trial counsel went through the following line of questioning:

> Q. What about when the crime scene technician lifted the gun out of the trunk of his car and shot himself in the foot with it, saying all the time that his finger was nowhere near the trigger, what about that, that wasn't an issue you thought worthy of investigation?
> A. It has been investigated.
> . . .
> Q. And there was never an issue as to whether or not the gun - that nobody fired the gun, that it went off accidentally?
> A. No, sir.
> . . .
> Q. Okay. Had you had your mind - you had your mind made up out there that night what happened didn't you?
> A: I had, from the investigation received on the scene and from my investigation, had concluded what had occurred, yes, sir.
> Q. Okay. On the scene?
> A. On the scene, the airport, forensics.
> Q. So by the airport your mind was made up?
> A. At that point, yes, sir.

*Id*. at 110 – 111. On redirect examination, Rawlston stated that the statements of the witnesses and "[Petitioner's] response… in the case after advising him of his rights" contributed to his decision. *Id*. at 111. Trial counsel objected that they had not been made aware of any such statement and the prosecutor stated that Detective Rawlston was planning to "say something to the effect of I hope this is a dream or something like that." *Id*. at 111 – 112. Trial counsel

acknowledged he was aware of this statement. *Id*. at 112. Detective Rawlston then testified that after he advised Petitioner of his rights and Petitioner indicated that he understood, Petitioner agreed to speak with him and stated "I hope this is only a dream," but never indicated at that time that this was an accidental discharge. *Id*. Petitioner conceded both that he made this statement and that he never told anyone at the airport that the shooting was an accident, but insisted he did not discuss anything else because of the "racial tension" at the airport. *Id*. at *113.

During closing arguments, the State highlighted Petitioner's failure to tell anyone that the shooting was an accident. *Id*. at *113 – 114. Specifically, the prosecutor said:

> Given the opportunity, did he tell anybody that it was an accident? He makes the [9-1-1] call . I think the testimony came in it's four minutes later… But when he does, what's the first communication? He knows he has been caught. I want to turn myself in, I just shot my wife. That's consistent with guilt. When asked why did you shoot your wife, finally, he didn't say it was an accident.
> Mark Rawlston, talked to Mark Rawlston, he said he hoped it was only a dream. It definitely wasn't a dream. Didn't say an accident. He didn't tell anybody it was an accident, didn't present it.

*Id*. Trial counsel then in his own closing tried to highlight both that Detective Rawlston had his mind made up by the time he reached the airport, and that while Petitioner did not tell the officers that the shooting was an accident, he also did not state that it was not and that his statement "I hope this is all a dream," is not actually inconsistent with the theory of accident. *Id*. at *114.

The TCCA held that while the "constitutional right to remain silent after arrest may not be exploited by the prosecution at trial[,]" Petitioner's claim fails because he failed to establish by clear and convincing evidence that he invoked his right to remain silent after *Miranda* warnings. *Id*. at *115 – 116 (citing *Doyle v. Ohio*, 426 U.S. 610, 618 (1976)). The TCCA said that although Petitioner was under arrest, Detective Rawlston testified that Petitioner voluntarily agreed to speak with him, making Rawlston's statement a comment on Petitioner's decision to make a voluntary statement, rather than his silence. *Id.* at *116. The TCCA held that because there was no error,

there was no deficient performance by trial counsel. The TCCA likewise held that there was no prejudice because the State did not overly emphasize Detective Rawlston's testimony during closing and the jury heard the 9-1-1 call where Petitioner did not say the shooting was an accident. *Id*. The TCCA also provided that because there was no error here, appellate counsel will also not be faulted for failing to raise this issue on appeal. *Id*.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Criminal defendants have a right to remain silent and doing so cannot be used as substantive evidence of guilt. *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, a defendant's silence during custodial interrogation may not be used to impeach the defendant's testimony at trial. *Doyle*, 426 U.S. 610 at 619. However, the *Doyle* rule does not apply where defendant waives his right to silence, expressly or implicitly, after *Miranda* warnings. *United States v. Lawson*, 476 F. App'x 644, 650 (citing *United States v. Crowder*, 719 F.2d 166, 172 (6th Cir.1983) (en banc)); *see North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that a waiver may be inferred "from the actions and words of the person interrogated"). Relying on *Butler*, the Supreme Court has held that an uncoerced statement following *Miranda* warnings may constitute a valid waiver of the right to remain silent, when the accused understood his rights. *Berghuis v. Thompkins*, 560 U.S. 370, 385 – 86 (2010).

The Court cannot find that the TCCA unreasonably applied *Strickland* when it found that Petitioner's counsel was not deficient in this regard. Petitioner and the Respondent seem to be in accord that Petitioner was under arrest, had been advised of his rights, and understood those rights. Petitioner does not contest that he made a statement after that point, but seems to imply that anything he did not say during that statement could not be used in trial. To hold so would be a logical fallacy. Because Petitioner's statements were made after valid and understood *Miranda*

warnings, they constitute an implicit waiver of his right to remain silent and do not fall within the *Doyle* prohibition. *See Berghuis*, 560 U.S. at 385 – 386. As such, Detective Rawlston was permitted to comment on the entirety of what Petitioner did say. Even without explicit comment by Detective Rawlston, anything Petitioner did not say could have been logically inferred. Even if counsel was found deficient, the Court could not find prejudice sufficient to undermine the reliability of the trial.

Even without comments by Detective Rawlston or the prosecution about what Petitioner did not say, the jury was quite capable of discerning it on their own, particularly when the tape recorded 9-1-1 call made by Petitioner where he also did not indicate that the shooting was an accident, was before them. Neither trial nor appellate counsel will be faulted for failing to raise this meritless claim.

### 8. Calling of Divorce Attorney

Petitioner alleges that counsel was deficient for failing to make a reasonable decision in the calling of Petitioner's divorce attorney, Ken Lawson, and for failure to request a jury-out hearing regarding the waiver of attorney-client privilege regarding this witness [Doc. 3 at 79 – 82]. Respondent characterizes this claim as involving a credibility dispute between Petitioner, who claims he was not consulted on the decision to call Ken Lawson or on the waiver of attorney-client privilege, and trial counsel, who claimed that the calling of this witness and the waiver were a result of client's own decision [Doc. 15 at 29 – 32]. The Court cannot find that the TCCA's holding that trial counsel was not deficient was an unreasonable application of *Strickland*, or based on an arbitrary finding of fact, therefore Petitioner is not entitled to habeas relief on this claim.

At trial, counsel called Mr. Lawson who testified on direct-examination that the parties were divorcing amicably, and that it was a mutual decision based on irreconcilable differences.

*Kendrick*, 2015 Tenn. Crim. App. 887, at \*54 – 55.  He likewise testified that under the terms of the divorce Petitioner would be receiving child support from his wife, that he would have primary custody of the couple's children, and would retain most of the marital property.  *Id*. at \*55, \*58. He likewise served as a character witness, stating that he believed Petitioner to be a "truthful and honest" person.  *Id*. at \*55.

Petitioner's complaints regarding Mr. Lawson's testimony began at cross-examination, where the State asked Mr. Lawson if he had discussed adultery or other grounds for divorce with the couple.  *Id*. at \*55.  Mr. Lawson then asserted attorney-client privilege.  *Id*.  After his assertion, the parties held a bench conference at which trial counsel, prior to the court's ruling on privilege, stated "I'll make this easy for everybody.  As long as I can do it in front of the jury, we'll waive the privilege.  As long as I can announce it when counsel does it." *Id*. at \*56.  He then stated that he was comfortable doing so after conferring with Petitioner, at which point the court allowed counsel to waive privilege and the testimony to proceed.  *Id*. at \*56 – 57.  At this point, Mr. Lawson admitted that he had discussed adultery grounds with Petitioner, who suspected that his wife was having an affair, although Lawson could not recall specifics about this conversation.  *Id*. at \*57. After this conversation, the couple attempted to reconcile, but their attempts failed and the couple agreed to file for divorce on the basis of irreconcilable differences. *Id*. at \*57.  Mr. Lawson testified that "[h]er affair had nothing to do with it at that point." Mr. Lawson stated that although in initial conversations Petitioner's mood was "more of a combination of anger and discouragement[,]" that later on the Petitioner "seemed more resigned to it" and told Mr. Lawson that he did not harbor any "aggressive feelings" towards the victim.  *Id*. at 57 – 58.

Petitioner first alleges counsel's deficiency in calling this witness, because had counsel performed better pre-trial investigation, he would have either not called Mr. Lawson, or limited

his testimony to character only [Doc. 3 at 80]. Next, Petitioner claims that trial counsel waived his attorney client privilege without consulting him and erred in doing so, as it allowed the State to insinuate the shooting was motivated by suspicions of adultery, and that counsel should have requested a jury out hearing before agreeing to waive privilege [Doc. 3 at 80 – 82].

The TCCA first found that regardless of Petitioner's contentions, Mr. Lawson's testimony actually corroborated Petitioner's testimony regarding the divorce and the couple's accord in the matter, and further demonstrated that the death of his wife would be tangibly detrimental to Petitioner under the terms of the divorce. *Id*. at *60. The court clarified that the fact that some elements of this witness's testimony were less than favorable did not amount to the deficiency of counsel. *Id*. Further, the court noted that post-conviction hearings established that the calling of the divorce attorney and the waiving of attorney-client privilege was a strategic decision at least partially directed by Petitioner. *Id*. at *61. The TCCA then found that Petitioner failed to demonstrate either deficiency of counsel or prejudice. *Id*.

The Court does not find that the TCCA unreasonably applied *Strickland* to determine that counsel was not deficient or made an arbitrary finding of fact in this regard. Counsel made a strategic decision to call this witness and to waive privilege. Due to the couple being in the process of divorce, motive could have been implied or naturally inferred with or without the testimony of Mr. Lawson. This witness had pertinent and useful information regarding lack of contention in the divorce, and thus lack of motive, which was important to the defense. Even if counsel knew of the prior adultery conversation between Petitioner and Mr. Lawson, the Court could not say that his professional decision that the benefit of this testimony outweighed any potential negatives is objectively unreasonable. Much less could the Court find that the state court had no reasonable basis for deciding so. Once Mr. Lawson had asserted privilege, it could have seemed to the jury

that he was hiding something and counsel again made a strategic decision in order to soften any suspicions. Although Petitioner claims he was not consulted about such decisions, he has not demonstrated so by clear and convincing evidence. Petitioner is not entitled to habeas relief on this claim.

### 9. Calling Randall Leftwich

Petitioner claims that counsel was ineffective because he failed to fully investigate, interview, or call Randall Leftwich, Petitioner's cousin, to testify [Doc. 3 at 82 – 86]. Respondent states that although Leftwich's testimony may have provided useful corroboration, it does not necessarily follow that counsel was deficient for failing to call him as a witness [Doc. 15 at 32 – 35]. The Court cannot find that the TCCA's finding that counsel was not deficient for failing to call this singular witness is an unreasonable application of *Strickland*.

Petitioner first raised this claim in his state post-conviction petition. At post-conviction hearings, Mr. Leftwich stated that he would have been available to testify at trial, that he did not recall being contacted by trial counsel or an investigator prior to trial, and then summarized information he had that may have been useful to present to the jury. *Kendrick*, 2015 Tenn. Crim. App. 887, at *61 – 62. Leftwich testified that his parents owned the home that the couple lived in at the time of the shooting, which they remained in even during their divorce proceedings. *Id*. He saw the couple interact on the day of the shooting when Petitioner's car broke down and Leftwich went to assist; Petitioner called the victim who then bought needed car parts and delivered them to Petitioner and Leftwich. *Id*. at *62. Leftwich indicates that there was no indication of a problem between the couple at that time. *Id*. After learning of the shooting, Leftwich's mother asked him to go secure Petitioner's residence where he discovered cabbage that had been left simmering on the stove. *Id*. At post-conviction hearings, trial counsel testified that he could not recall whether

he or anyone else contacted Mr. Leftwich, but did note that Petitioner was very engaged in the direction of his trial and that counsel frequently consulted with Petitioner on which witnesses to call. *Id*. at *63. Petitioner rebutted that Leftwich logically should have been interviewed to corroborate Petitioner's testimony because Petitioner informed trial counsel that he was with Leftwich on the day of the shooting and that the calling of witnesses was a decision for counsel. *Id*.

The TCCA agreed that Leftwich could have provided corroborating testimony, but declined to find counsel deficient for failing to interview and call him as a corroborating witness. *Id*. at *64 – 65. First, the TCCA noted one small discrepancy between Petitioner's testimony and Leftwich's, regarding the victim's mood upon having to deliver car parts to Petitioner, and second noted that as Petitioner was very involved with the direction of his case, he could have informed trial counsel of his desire to have Leftwich testify and counsel was likely to have complied, as he did in other circumstances. *Id*. at *65. Further the Court found no prejudice from the absence of this testimony because the testimony was largely cumulative or corroborative. *Id*. at *66 – 67. As to the non-corroborative evidence, regarding the cabbage simmering on the stove, the TCCA found that Petitioner did not demonstrate by clear and convincing evidence that he knew about or alerted trial counsel to Leftwich's discovery of the cabbage, which Petitioner alleges undermines premeditation, before or at the time of trial. *Id*. at *67.

Petitioner raises two distinct claims here: the failure to investigate Randall Leftwich as a witness and the failure to call Randall Leftwich as witness. *See English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). To determine if counsel was ineffective for failing to investigate, the Court must assess the reasonableness of counsel's "investigation or lack thereof." *English v. Romanowski*, at 726. As with all ineffective assistance claims, Petitioner must still demonstrate

prejudice resulting from this action. *Strickland*, 466 U.S. at 687. To show that counsel was ineffective for failing to call witnesses, Petitioner must establish that the witness had favorable information and the lack of that witness's testimony prejudiced his defense. *Pillette v. Berghuis*, 408 Fed. Appx. 873, 882–83 (6th Cir. 2010) (citing *Towns v. Smith*, 395 F.3d 251, 258 – 60 (6th Cir. 2005)). However, "defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).

Here, the Court cannot find the TCCA's holding that counsel was not deficient for failing to investigate or call Randall Leftwich to testify is based on an unreasonable finding of fact or application of law. The TCCA considered Leftwich's potential testimony in two categories: first, corroborative evidence regarding Petitioner's account of the day of the shooting and good relationship with the victim and second, evidence of cabbage simmering at Petitioner's home that could have showed a lack of premeditation. Counsel was not deficient for failing to investigate or call Leftwich when he had no indication that Leftwich had potentially exculpatory information and only knew of Leftwich's potentially corroborative testimony. Petitioner did not establish by clear and convincing evidence that counsel had any indication of the "cabbage simmering" testimony, the only piece of Leftwich's testimony that was not merely cumulative. The Court cannot say that the TCCA had no reasonable basis for their decision that counsel was not constitutionally ineffective. Petitioner is not entitled to relief on this claim.

### 10. Calling Officer Lapoint

Petitioner alleges that counsel was deficient in failing to investigate, call, or otherwise seek to introduce the information available through Officer William Lapoint, as such would have communicated Petitioner's state of mind to the jury [Doc. 3 at 86 – 88]. Respondent states that

the TCCA found that the jury had other evidence from which it could discern Petitioner's demeanor and in addition notes that Officer Lapoint's testimony was only relevant to Petitioner's state of mind after the event, while the TCCA focused only on his calmness before as indicative of premeditation and deliberation [Doc. 15 at 53 – 55]. Because Petitioner cannot show that this witness had favorable information, the TCCA's holding that counsel was not deficient in this regard is not unreasonable.

Officer Lapoint was present at the airport where Petitioner was arrested. *Kendrick*, 2015 Tenn. Crim. App. 887, at *106. At that time, he went to the police vehicle Petitioner was in to talk to the Petitioner. *Id*. At post-conviction hearings, Officer Lapoint described Petitioner as "very distraught" and noted that he was rocking his body, crying, and that he stated "I can't believe I did that." *Id*. Officer Lapoint testified that he put a tape recorder in the patrol car set to record Petitioner, but did not check that the tape recorder was working before doing so. *Id*. When the recorder was returned, it did not work because the batteries had corroded; other officers told Officer Lapoint there was nothing on the tape contained in the recorder. *Id*. The Petitioner noted at trial that the tape recorder was placed in the patrol car with him and that he believed that there must have been evidence favorable to him on the tape because the prosecution did not play it. *Id*. at *107.

On motion for new trial, counsel raised the State's failure to include the tape in discovery, but as the court denied the motion, appellate counsel chose not to raise it on appeal. *Id*. at *107. Trial counsel testified at post-conviction that he did not recall ever hearing about the tape recorder and did not recall speaking to Officer Lapoint. *Id*.

The TCCA held that counsel was not deficient in this regard for multiple reasons. First, Petitioner only alleged that this tape could have had evidence relevant to his mental state after the

shooting, an issue which the jury had substantial alternative evidence on: testimony from Ms. Maston stating that Petitioner was crying, the tape of Petitioner's 9-1-1 call, and Petitioner's own testimony. Second, Petitioner's state of mind post-shooting was not used as evidence of premeditation and deliberation, but rather his calmness before the shooting. *Id.* at *107 – 109. Lastly, the tape has never been found and there is no indication of what was on it, not even by Petitioner.[19] *Id.* The TCCA held that for all these reasons, Petitioner failed to establish either deficient performance or prejudice in this regard. *Id.*

This Court does not find that the state courts unreasonably applied *Strickland* to find that counsel was not deficient. Petitioner has not proven the factual basis of this claim by clear and convincing evidence – he has not demonstrated whether trial counsel ever heard about the tape or knew of Lapoint's existence as his name was not provided in discovery. This court likewise finds no prejudice where there is no indication as to the contents of the tape on which to assess their potential outcome on the verdict. Petitioner is not entitled to relief on this claim.

## 11. Improper Jury Promise in Opening Argument

Although neither the state courts nor the Respondent address this issue, the Court finds that it was properly presented in Petitioner's brief to the TCCA appealing the second dismissal of his post-conviction petition [Doc. 14 Attachment 47 at 82 – 83]. As such, this claim will be reviewed de novo. *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). Petitioner raises here that counsel was ineffective because, in his opening statement, counsel made an unfulfilled promise to the jury that irreparably damaged Petitioner's credibility [Doc. 3 at 94 – 106]. In opening statement, counsel informed the jury that Petitioner's wife was killed by a faulty rifle and that the jury would

---

[19] Petitioner seems to contend throughout the record that there must have been information useful to his defense on the tape and that provided motivation for the State to suppress it. However, he has not offered any evidence of what is on the tape and this Court is not in the position of assuming such malintent without proof.

hear from Officer Miller that the firearm discharged, shooting him in the foot, without his hands anywhere near the trigger [Doc. 14 Attachment 47 at 82 – 83]. As detailed above, Officer Miller did not expressly testify that his finger was not on the trigger during his accident, but rather that he could not recall his posture. However, counsel did elicit some proof from Officer Miller indicating that his finger was not near the trigger. Petitioner alleges that counsel did not have a proper basis for this claim because he had not interviewed Officer Miller and that he should have realized by the State's plan to call Officer Miller and Agent Fite that Officer Miller's testimony had changed [Doc. 3 at 94 – 106].[20]

"It is unreasonable for counsel to promise testimony to the jury without first examining the availability and soundness of such testimony where counsel could, and should, have discovered these details prior to trial." *Plummer v. Jackson*, 491 Fed. Appx. 671 (6th Cir. 2012)(citing *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010)). Such an unfulfilled promise can create a negative inference in the mind of the jury, who may wonder why the promised testimony was not proffered. *See English*, 602 F.3d at 729. However, *English* makes clear that the ineffective assistance of counsel is formed by the lack of a reasonably investigated basis for the promise, not just the unfulfilled promise itself. *English* 729. While counsel generally has a duty to make reasonable investigation, *Strickland* clarifies that counsel can also reasonably determine that certain investigations are unnecessary. *Strickland*, 466 U.S. 668, n. 19.

In Petitioner's case, it was a reasonable decision for counsel to rely on previous signed statements by Officer Miller to inform his expectations for Officer Miller's trial testimony and his opening argument. Regardless of Petitioner's contention that counsel should have anticipated the

---

[20] Petitioner seems to allege that because Agent Fite testified that the gun could not fire without the trigger being pulled or the gun being broken, and Officer Miller's statement declared that the gun had fired without his finger on the trigger, that counsel should have deduced that there was a change in Officer Miller's testimony because the State would not put contradicting witnesses on the stand.

change in testimony, this was an unforeseeable alteration, by a witness that counsel had no reason to presume was unreliable. Given his limited time and resources, it was reasonable for counsel to focus on other investigation rather than calling Officer Miller and every other officer to verify their sworn, written statements. Additionally, even if Petitioner had demonstrated deficiency, he cannot demonstrate prejudice. As *English* notes, the damage from such unfulfilled promises occurs when the jury is left to infer why such testimony was not raised or believes that counsel lied. *English*, 602 F.3d at 729. Here, counsel took or attempted to take measures to make it abundantly clear to the jury that he proposed that Officer Miller would say his finger was not on the trigger because he had said so before. Petitioner cannot show that this error, after being explained to the jury, was sufficient to undermine the reliability of the results of his trial.

## V. CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus [Doc. 1] will be **DENIED** and this action will be **DISMISSED**.

## VI. CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but

reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists would not disagree that Petitioner procedurally defaulted his claims, nor would they disagree that neither Petitioner's trial nor appellate counsel was constitutionally ineffective. Accordingly, a **COA SHALL NOT ISSUE.**

**AN APPROPRIATE ORDER WILL ENTER.**

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE